[No. B222596. Second Dist., Div. Three. Aug. 17, 2011.]

JODIE BULLOCK, Plaintiff and Respondent, v.
PHILIP MORRIS USA, INC., Defendant and Appellant.

**COUNSEL**

Shook, Hardy & Bacon, Frank P. Kelly; Mayer Brown, Lauren R. Goldman; Arnold & Porter, Ronald C. Redcay and E. Alex Beroukhim for Defendant and Appellant.

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Law Offices of Michael J. Piuze, Michael J. Piuze; and Kenneth Chesebro for Plaintiff and Respondent.

OPINION

**CROSKEY, J.**—Philip Morris USA, Inc. (Philip Morris), appeals a judgment awarding Jodie Bullock $13.8 million in punitive damages after a jury trial. A jury previously had awarded $850,000 in compensatory damages. Philip Morris contends the punitive damages award is barred by res judicata as a result of the settlement of an action by the California Attorney General against Philip Morris and other cigarette manufacturers, and the award is unconstitutionally excessive. Philip Morris also challenges the award of prejudgment interest from the date of the verdict. We conclude that each of these contentions is without merit.

This action involves a different cause of action from the prior action by the Attorney General so res judicata is inapplicable. In addition, Philip Morris's conduct in intentionally deceiving smokers and the public in general for several decades concerning the adverse health effects of cigarette smoking, while formulating its cigarettes so as to make them more addictive, and aggressively advertising to youths and others before July 1, 1969, was extremely reprehensible. In light of such extreme reprehensibility, including the vast scale and profitability of Philip Morris's misconduct, and its strong financial condition, the $13.8 million in punitive damages, approximately 16 times the compensatory damages award, is not unconstitutionally excessive. Finally, the trial court properly awarded prejudgment interest from the date of the verdict pursuant to Civil Code section 3287, subdivision (a) and rule 3.1802 of the California Rules of Court. In light of these conclusions, we will affirm the judgment and the order awarding prejudgment interest.

## *FACTUAL AND PROCEDURAL BACKGROUND*

### 1. *Factual Background*[1]

Betty Bullock smoked cigarettes manufactured by Philip Morris for 45 years from 1956, when she was 17 years old, until she was diagnosed with lung cancer in 2001. She smoked Philip Morris's Marlboro brand of cigarettes until 1966, and then switched to its Benson & Hedges brand. She died in February 2003.

Scientific and medical professionals in the United States and worldwide generally agreed by the late 1950's that cigarette smoking caused lung cancer, after several epidemiological studies reached that conclusion. Philip Morris

---

[1] Our recitation of the facts is based on the evidence presented at trial viewed in the light most favorable to Bullock as the successful plaintiff. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693–694 [101 Cal.Rptr.3d 773, 219 P.3d 749].)

and other cigarette manufacturers sought to cast doubt on the increasing body of knowledge supporting the conclusion that smoking caused lung cancer and sought to assuage smokers' concerns. To that end, Philip Morris and other cigarette manufacturers issued a full-page announcement in newspapers throughout the United States in January 1954 entitled "A Frank Statement to Cigarette Smokers." The announcement stated, "Recent reports on experiments with mice have given wide publicity to a theory that cigarette smoking is in some way linked with lung cancer in human beings" (some capitalization omitted), and stated that "[d]istinguished authorities point[ed] out" that there was no proof that cigarette smoking caused cancer and that "numerous scientists" questioned "the validity of the statistics themselves."

The "Frank Statement" stated, "We accept an interest in people's health as a basic responsibility, paramount to every other consideration in our business. [¶] We believe the products we make are not injurious to health. [¶] We always have and always will cooperate closely with those whose task it is to safeguard the public health." It announced the formation of the Tobacco Industry Research Committee and stated, "We are pledging aid and assistance to the research effort into all phases of tobacco use and health. This joint financial aid will of course be in addition to what is already being contributed by individual companies. [¶] . . . [¶] In charge of the research activities of the Committee will be a scientist of unimpeachable integrity and national repute. In addition there will be an Advisory Board of scientists disinterested in the cigarette industry. A group of distinguished men from medicine, science, and education will be invited to serve on this Board. These scientists will advise the Committee on its research activities." In the years that followed, the Tobacco Industry Research Committee and its publicists disseminated the message that there was no proof that cigarette smoking was a cause of lung cancer and other diseases through news releases, distribution of research and editorial materials favorable to the tobacco industry, personal contacts with editors, journalists, and producers, and other means.

Philip Morris for many years publicly continued to insist that there was no consensus in the scientific community that cigarette smoking was a cause of lung cancer and that Philip Morris was actively pursuing scientific research to resolve the purported controversy, while privately acknowledging that there was no true controversy, that its true goal was to discredit reports that linked smoking with lung cancer, and that it had no intention of funding research that would reveal the health hazards of smoking. The Tobacco Institute, a trade organization funded by Philip Morris and other cigarette manufacturers, issued a press release in 1961 discrediting a recent article and stating that the views that smoking caused cancer "are a subject of much disagreement in the scientific world" and "the cause or causes of lung cancer continue to be unknown." The Tobacco Institute stated in a press release in 1963 that the tobacco industry was "vitally interested in getting the facts that will provide

answers to questions about smoking and health," and described the industry's research efforts as a "crusade for research—in the agricultural stations, the scientific laboratories, and the great hospitals and medical centers of the nation." It stated, "the industry does not know the causes of the diseases in question."

A cigarette company executive appearing before Congress in 1965 on behalf of several cigarette manufacturers, including Philip Morris, stated that "[n]early everyone familiar with these difficult problems will agree . . . that there is a very high degree of uncertainty" whether "smoking causes cancer or any other disease." Later that year, the Tobacco Institute issued a press release stating, "Research to date has not established whether smoking is or is not causally involved in such diseases as lung cancer and heart disease, despite efforts to make it seem otherwise. The matter remains an open question—for resolution by scientists." The press release stated, "we are earnestly trying to find the answers," and, "If there is something in tobacco that is causally related to cancer or any other disease, the tobacco industry wants to find out what it is, and the sooner the better. If it is something in tobacco or the smoke, I am sure this can be remedied by the scientists."

Philip Morris's chief executive officer and chairman of the executive committee of the Tobacco Institute, Joseph Cullman III, stated on the television news program *Face the Nation* (CBS, Jan. 3, 1971), "if any ingredient in cigarette smoke is identified as being injurious to human health, we are confident that we can eliminate that ingredient." He stated further, "We do not believe that cigarettes are hazardous; we don't accept that." The Tobacco Institute issued a report in 1979 entitled Smoking and Health 1969–1979: the Continuing Controversy, stating, "Scientists have not proven that cigarette smoke or any of the thousands of its constituents as found in cigarette smoke cause human disease." The Tobacco Institute issued a report in 1984 entitled The Cigarette Controversy: Why More Research is Needed, and emphasized that *"it is not known whether smoking has a role in the development of various diseases* and . . . *a great deal more research is needed to uncover the causes and the mechanisms involved in their onset."* The 1984 report stated that the theory that cigarette smoking causes various diseases "is just that, a theory" and stated, "There were basic flaws in the methods used in the major epidemiological surveys that cast doubts on the accuracy of the claimed correlations."

Contrary to its repeated public pronouncements, Philip Morris privately acknowledged the link between cigarette smoking and lung cancer and other diseases and sought to avoid promoting any research that would reveal that link. An internal document prepared by Philip Morris in 1961 for purposes of

research and development stated, "Carcinogens are found in practically every class of compounds in smoke," and provided a "partial list" of 40 "carcinogens" in cigarette smoke.

A 1970 memorandum from a Philip Morris research scientist to its president stated of the Council for Tobacco Research, the successor of the Tobacco Industry Research Committee, "It has been stated that CTR is a program to find out 'the truth about smoking and health.' What is truth to one is false to another. CTR and the Industry have publicly and frequently denied what others find as 'truth.' Let's face it. We are interested in evidence which we believe denies the allegation that cigarette smoking causes disease." Notes from a 1978 meeting of cigarette company executives and legal counsel state that the Tobacco Industry Research Committee "was set up as an industry 'shield' " and that the Council for Tobacco Research "has acted as a 'front.' "

Dr. William Farone, a chemist employed by Philip Morris as a scientific researcher beginning in 1976 and as director of applied research from 1977 to 1984, testified at trial that scientists working for Philip Morris knew that cigarette smoking caused cancer many years before he began to work for the company. Dr. Farone testified that during his years at Philip Morris there was no controversy among its scientists as to whether smoking caused diseases, and that public statements that it was not known whether smoking played a role in the development of various diseases and that a great deal more research was needed to identify the causes of the diseases were false. He testified that another public statement challenging the epidemiological research as inconclusive was a misleading half-truth and that Philip Morris's scientists knew that cigarette smoke contained carcinogens and that the carcinogens caused cancer.

Dr. Farone testified that Dr. Thomas Osdene, Philip Morris's director of research, and others told him on several occasions that Dr. Osdene's real job and the job of scientists working under him was to maintain the appearance of a scientific controversy concerning smoking and health. Moreover, Dr. Farone testified that Philip Morris performed no animal toxicity studies of cigarettes in the United States, pursuant to a "gentleman's agreement" with other cigarette manufacturers, but arranged for a company in Germany to perform toxicity tests on animals there. Other Philip Morris scientists explained to Dr. Farone that the reason for testing cigarettes abroad was so the results would not be available by subpoena in the United States. The test results were sent to Dr. Osdene, usually at his home, who would report the results to other Philip Morris scientists verbally and destroy the written records.

Philip Morris conducted animal research in the United States on the addictive effects of nicotine in the early 1980's. It sought to develop a

substitute for nicotine that would produce the same addictive effects but without the adverse cardiovascular effects of nicotine. Philip Morris closely guarded the results of its research and threatened to sue its former scientists who proposed publication of an article. Philip Morris successfully developed nicotine analogs and had the ability to remove nicotine from cigarettes, but did not do so. Moreover, Philip Morris added urea to cigarettes, which becomes ammonia when heated, to enhance the effect of nicotine. Philip Morris added approximately 250 different substances to tobacco in cigarettes to enhance the flavor and for other purposes. A former Philip Morris research scientist who worked for the company in the early 1980's testified, "Never once in my whole time at the company did I hear any concern for the customer, other than one scientist[] who was complaining that he was repeatedly—repeatedly having his research changed in direction any time he came upon some hot research."

Philip Morris heavily advertised its cigarettes on television in the 1950's and 1960's, until the federal government banned cigarette advertising on television in 1970. Television advertising had a particularly strong influence on youths under the age of 18, for whom there was a positive correlation between television viewing time and the incidence of smoking. Philip Morris's print advertisements for Marlboro and other cigarette brands in 1956, when Bullock began smoking at the age of 17, and generally in the years from 1954 to 1969, depicted handsome men and glamorous young women. Some advertisements featured slogans such as "Loved for Gentleness" and "The gentlest cigarette you can smoke."

The Attorney General of California, on behalf of the People of California, and the California Director of Health Services filed a complaint against several cigarette manufacturers, including Philip Morris, and other tobacco industry organizations in 1997. They alleged that the defendants had conspired to deceive the public concerning the adverse health effects of smoking by suppressing truthful information and spreading disinformation. They also alleged that the defendants had specifically targeted minors in their advertising and marketing campaigns. The Attorney General and Director of Health Services alleged counts for (1) recovery of the value of Medi-Cal benefits provided to treat smoking-related injuries and illnesses (Welf. & Inst. Code, § 14124.71); (2) restraint of trade in violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.); (3) violation of the False Claims Act (Gov. Code, § 12650 et seq.); and (4) unfair competition (Bus. & Prof. Code, § 17200 et seq.). They sought compensatory and punitive damages, civil penalties and a permanent injunction. Similar actions were commenced against the same defendants in other states.

Philip Morris and other cigarette manufacturers entered into a master settlement agreement (MSA) with 46 states, including California, in 1998

settling the civil litigation by the states against the manufacturers. The manufacturers denied the allegations of wrongdoing and admitted no liability, but agreed to several restrictions on the advertising and promotion of cigarettes. They also agreed to dissolve the Tobacco Institute, the Council for Tobacco Research, and the Council for Indoor Air Research, and agreed not to target youths as smokers or potential smokers, suppress research on the health hazards of smoking, or make any misrepresentation of fact concerning the health consequences of smoking. The participating cigarette manufacturers also agreed to pay several billion dollars per year to the states, with each manufacturer responsible for a portion of the total payment according to its market share. The trial court in the action by the Attorney General and the Director of Health Services entered a consent decree and final judgment (Consent Decree) in December 1998, incorporating the MSA.

Philip Morris issued a statement on its Internet site in December 1999 acknowledging for the first time, "There is an overwhelming medical and scientific consensus that cigarette smoking causes lung cancer, heart disease, emphysema and other serious diseases in smokers. Smokers are far more likely to develop serious diseases, like lung cancer, than non-smokers. There is no 'safe' cigarette. These are and have been the messages of public health authorities worldwide." The statement also acknowledged that cigarette smoking is addictive.

## 2. Trial Court Proceedings and Prior Appeal

Betty Bullock sued Philip Morris in April 2001 seeking to recover damages for personal injuries based on products liability, fraud and other theories. The jury returned a special verdict in September 2002 finding that there was a defect in the design of the cigarettes and that they were negligently designed; that Philip Morris failed to adequately warn Bullock of the dangers of smoking before July 1, 1969;[2] that it intentionally and negligently misrepresented material facts and made a false promise; that it intentionally concealed material facts before July 1, 1969; and that each of those acts of misconduct was a cause of Bullock's injury. The jury found that Philip Morris was guilty of malice, fraud or oppression with respect to each count. The jury awarded Bullock $850,000 in compensatory damages, including $100,000 in noneconomic damages for pain and suffering, and later awarded her $28 billion in punitive damages. The trial court entered a judgment on the jury verdict.

---

[2] Federal law preempts certain state law claims arising from the advertising or promotion of cigarettes after July 1, 1969. (15 U.S.C. § 1334(b); Public Health Cigarette Smoking Act of 1969, Pub.L. No. 91-222, § 3 (Apr. 1, 1970) 84 Stat. 88; *Altria Group, Inc. v. Good* (2008) 555 U.S. 70 [172 L.Ed.2d 398, 129 S.Ct. 538, 545–548]; see *Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 523–530 [120 L.Ed.2d 407, 112 S.Ct. 2608] (plur. opn. of Stevens, J.).)

The trial court denied Philip Morris's motion for judgment notwithstanding the verdict and denied in part its motion for a new trial, but granted the new trial motion as to excessive damages, with the condition that the court would deny the new trial motion if Bullock consented to reduce the punitive damages award to $28 million. She consented to the reduction. The court entered an amended judgment in January 2003 awarding a total of $28,850,000 in compensatory and punitive damages. Both parties appealed the amended judgment. Betty Bullock died in February 2003.[3]

On appeal, we concluded that the refusal of Philip Morris's proposed instruction prohibiting punishment for harm caused to others was error and that the punitive damages award therefore must be reversed, but that there was no error in the compensatory damages award or the finding of oppression, fraud or malice. (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 667, 693–695 [71 Cal.Rptr.3d 775].) We therefore reversed the judgment as to the amount of punitive damages only and remanded the matter for a new trial limited to determining the amount of punitive damages.[4] (159 Cal.App.4th at p. 702.)

The jury in the limited retrial returned a special verdict on August 24, 2009, awarding Bullock $13.8 million in punitive damages. The trial court entered an amended judgment on December 1, 2009, awarding $850,000 in compensatory damages, pursuant to the prior judgment, and $13.8 million in punitive damages. The court denied Philip Morris's motion for judgment notwithstanding the verdict. The court granted Bullock's motion for prejudgment interest on the punitive damages award from the date of the verdict. Philip Morris timely appealed the amended judgment and the order granting the motion for prejudgment interest.

## *CONTENTIONS*

Philip Morris contends (1) the Consent Decree bars any award of punitive damages in this case under the res judicata doctrine; (2) the $13.8 million punitive damages award is unconstitutionally excessive; and (3) the award of prejudgment interest from the date of the verdict was error.

---

[3] We ordered the substitution of Jodie Bullock in the place of Betty Bullock after the death of Betty Bullock (Code Civ. Proc., § 377.31; Cal. Rules of Court, rule 8.36(a)). We use the name Bullock to refer to either Jodie Bullock or Betty Bullock, as appropriate in context.

[4] We had previously affirmed the judgment, concluding that the punitive damages award was not constitutionally excessive. The California Supreme Court granted review of our prior opinion and later transferred the matter back to this court with directions to vacate our decision and reconsider the cause in light of *Philip Morris USA v. Williams* (2007) 549 U.S. 346 [166 L.Ed.2d 940, 127 S.Ct. 1057].

## DISCUSSION

### 1. *Res Judicata Is Inapplicable*

■ Res judicata, or claim preclusion, precludes the relitigation of a cause of action that was litigated in a prior proceeding if three requirements are satisfied: (1) the present action is on the same cause of action as the prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the parties in the present action or parties in privity with them were parties to the prior proceeding. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797 [108 Cal.Rptr.3d 806, 230 P.3d 342].) Res judicata not only precludes the relitigation of issues that were actually litigated, but also precludes the litigation of issues that could have been litigated in the prior proceeding. (*Busick v. Workmen's Comp. Appeals Bd.* (1972) 7 Cal.3d 967, 975 [104 Cal.Rptr. 42, 500 P.2d 1386]; *Amin v. Khazindar* (2003) 112 Cal.App.4th 582, 589–590 [5 Cal.Rptr.3d 224].)

■ For purposes of res judicata, a cause of action consists of the plaintiff's primary right to be free from a particular injury, the defendant's corresponding primary duty and the defendant's wrongful act in breach of that duty. (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904 [123 Cal.Rptr.2d 432, 51 P.3d 297] (*Mycogen*).) The violation of a primary right gives rise to only a single cause of action. (*Ibid.*) The plaintiff's indivisible primary right must be distinguished from both the legal theory on which the plaintiff seeks relief and the remedy sought. The plaintiff may seek various remedies based on different legal theories, all arising from a single cause of action. (*Ibid.*)

" '[T]he "cause of action" is based upon the harm suffered, as opposed to the particular theory asserted by the litigant. [Citation.] Even where there are multiple legal theories upon which recovery might be predicated, one injury gives rise to only one claim for relief. "Hence a judgment for the defendant is a bar to a subsequent action by the plaintiff based on the same injury to the same right, even though he presents a different *legal ground* for relief." [Citations.]' Thus, under the primary rights theory, the determinative factor is the harm suffered. When two actions involving the same parties seek compensation for the same harm, they generally involve the same primary right. [Citation.]" (*Boeken v. Philip Morris USA, Inc., supra*, 48 Cal.4th at p. 798.)

The primary right that Bullock seeks to vindicate in this action is based on her personal injuries. Those personal physical and emotional injuries differ from the economic injuries and injuries to market competition alleged by the Attorney General and the Director of Health Services in their complaint. We

therefore conclude that this action involves a different primary right and a different cause of action than the prior action that was resolved by the Consent Decree. Res judicata does not apply.[5]

## 2. *The Punitive Damages Award Is Not Unconstitutionally Excessive*

### a. *Due Process Limitation on Punitive Damages*

█ Punitive damages may be imposed under state law to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition. (*BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 568 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*Gore*).) States have considerable flexibility in determining the appropriate level of punitive damages to allow in different classes of cases and in any particular case. (*Ibid.*) The amount of punitive damages offends due process under the Fourteenth Amendment as arbitrary only if the award is " 'grossly excessive' " in relation to the state's legitimate interests in punishment and deterrence. (*Gore*, at p. 568; see also *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416–417 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*).)

A court determining whether a punitive damages award is excessive under the due process clause must consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. [Citation.]" (*State Farm, supra*, 538 U.S. at p. 418.) The defendant's financial condition also is an essential consideration for a court reviewing a punitive damages award under California law, and is a permissible consideration under the due process clause in determining the amount of punitive damages necessary to further the state's legitimate interests in punishment and deterrence. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1185–1186 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).)

On appeal, we defer to findings of historical fact if they are supported by substantial evidence, and we independently assess each of the three guideposts and determine de novo whether the punitive damages award is excessive under the due process clause. (*State Farm, supra*, 538 U.S. at p. 418;

---

[5] Opinions applying the laws of states that do not subscribe to the primary rights theory of res judicata, holding that personal injury actions were precluded by the settlement of tobacco litigation in other states in connection with the MSA, are neither on point nor persuasive. (E.g., *Grill v. Philip Morris USA, Inc.* (S.D.N.Y. 2009) 653 F.Supp.2d 481, 498; *Clinton v. Brown & Williamson Holdings, Inc.* (S.D.N.Y. 2007) 498 F.Supp.2d 639, 653; *Brown & Williamson Tobacco Corp. v. Gault* (2006) 280 Ga. 420 [627 S.E.2d 549, 553]; *Shea v. American Tobacco Co.* (N.Y.App.Div. 2010) 73 A.D.3d 730 [901 N.Y.S.2d 303, 305]; *Fabiano v. Philip Morris Inc.* (N.Y.App.Div. 2008) 54 A.D.3d 146 [862 N.Y.S.2d 487, 489–492].)

*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 436 [149 L.Ed.2d 674, 121 S.Ct. 1678] (*Cooper Industries*); *Simon, supra*, 35 Cal.4th at p. 1172 & fn. 2.) As the California Supreme Court stated in *Simon, supra*, at page 1188, "While we must, under *Cooper Industries, supra*, 532 U.S. 424, assess independently the wrongfulness of a defendant's conduct, our determination of a maximum award should allow some leeway for the possibility of reasonable differences in the weighing of culpability. In enforcing federal due process limits, an appellate court does not sit as a replacement for the jury but only as a check on arbitrary awards. [Citation.]"

### b. *Degree of Reprehensibility*

The degree of reprehensibility of the defendant's conduct is the most important indicator of the reasonableness of a punitive damages award. (*State Farm, supra*, 538 U.S. at p. 419; *Gore, supra*, 517 U.S. at p. 575.) The United States Supreme Court in *State Farm, supra*, 538 U.S. at page 419, stated: "We have instructed courts to determine the reprehensibility of a defendant by considering whether: [(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident. [Citation.] The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence. [Citation.]"

A court properly may consider the defendant's similar wrongful conduct toward others in determining the degree of reprehensibility of the defendant's conduct toward the plaintiff. As we stated in *Bullock v. Philip Morris USA, Inc., supra*, 159 Cal.App.4th at pages 690–691:

"A state generally has no 'legitimate concern in imposing punitive damages to punish a defendant for unlawful acts committed outside of the State's jurisdiction.' (*State Farm, supra*, 538 U.S. at p. 421.) 'A basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction. [Citation.]' (*Id.* at p. 422.) Moreover, '[a] defendant should be punished for the conduct that

harmed the plaintiff, not for being an unsavory individual or business. Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . . Punishment on these bases creates the possibility of multiple punitive damages awards for the same conduct . . . . [Fn. omitted.]" (*Id.* at p. 423, citation omitted.) This does not mean, however, that the defendant's similar wrongful conduct toward others should not be considered in determining the amount of punitive damages. (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1206–1208 & fn. 6 [29 Cal.Rptr.3d 401, 113 P.3d 82] (*Johnson*).)

■ "The reprehensibility of the defendant's conduct toward the plaintiff depends in part on the 'scale and profitability' of the course of conduct of which the defendant's conduct toward the plaintiff is a part. (*Johnson, supra,* 35 Cal.4th at pp. 1207–1208.) '[T]he court in *State Farm* noted that conduct involving "repeated actions" was worse than, and could be punished more severely than, conduct limited to "an isolated incident." (*State Farm, supra,* [538 U.S.] at p. 419.) [Fn. omitted.]' (*Johnson, supra,* at p. 1206.) The *State Farm* court stated that even '[l]awful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.'[6] (*State Farm, supra,* at p. 422.) The California Supreme Court in *Johnson* stated, 'To consider the defendant's entire course of conduct in setting or reviewing a punitive damages award, even in an individual plaintiff's lawsuit, is not to punish the defendant for its conduct toward others. An enhanced punishment for recidivism does not directly punish the earlier offense; it is, rather, " ' "a stiffened penalty for the last crime, which is considered to be an aggravated offense because a repetitive one." ' " (*Ewing v. California* (2003) 538 U.S. 11, 25–26 [155 L.Ed.2d 108, 123 S.Ct. 1179].) . . . By placing the defendant's conduct on one occasion into the context of a business practice or policy, an individual plaintiff can demonstrate that the conduct toward him or her was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature.' (*Johnson, supra,* at pp. 1206–1207, fn. 6.) *Johnson* stated further, 'The scale and profitability of a course of wrongful conduct by the defendant cannot justify an award that is grossly excessive in relation to the harm done or threatened, but scale and profitability nevertheless remain relevant to reprehensibility and hence to the size of award

---

[6] *State Farm* held that the Utah courts erred by awarding punitive damages based on the defendant's dissimilar acts that "had nothing to do with" the conduct that injured the plaintiffs. (*State Farm, supra,* 538 U.S. at pp. 422–424.) *State Farm* stated that there was no evidence of any conduct by the defendant similar to the conduct that harmed the plaintiffs (*id.* at p. 424) and concluded that the reprehensibility of the defendant's conduct, involving a purely economic transaction with no threat of physical harm, warranted "a more modest punishment" (*id.* at p. 419) than the $145 million in punitive damages awarded by the jury.

warranted, under the guideposts, to meet the state's interest in deterrence. . . . Nothing the high court has said about due process review requires that California juries and courts ignore evidence of corporate policies and practices and evaluate the defendant's harm to the plaintiff in isolation.' (*Id.* at p. 1207.)"

Philip Morris knew that the consensus among scientific and medical professionals was that cigarette smoking caused lung cancer and other serious diseases, that its cigarettes contained many carcinogens, and that smokers suffered lung cancer and other serious diseases at rates far greater than nonsmokers. Despite that knowledge, Philip Morris and other cigarette manufacturers for many years conducted a public campaign designed to obscure and deny the truth. Philip Morris falsely asserted that there was no consensus in the scientific and medical community concerning the adverse health effects of smoking and that the relationship between smoking and health was unknown. Philip Morris assured its customers that if it learned that any cigarette ingredient caused cancer it would remove that ingredient, and falsely stated that it did not believe that smoking was hazardous. Philip Morris repeatedly asserted that more research was needed and that it was diligently pursuing that research, but avoided sponsoring any research that would reveal the hazards of smoking and went to great lengths to avoid disclosing its own toxicological data. Rather than remove nicotine from its cigarettes as it had the ability to do, Philip Morris added urea to its cigarettes to enhance the effect of nicotine so as to further exploit its customers' addiction and gain new customers. Its customers included individuals such as Bullock who first began to smoke as youths before July 1, 1969, attracted in part by an aggressive advertising campaign in television, print and other media that was particularly appealing to youths.

The harm caused by Philip Morris's misconduct was physical rather than economic because the evidence shows that Bullock suffered a debilitating and terminal illness, lung cancer, as a result of Philip Morris's fraudulent scheme. The first reprehensibility factor listed by the court in *State Farm, supra,* 538 U.S. at page 419, "whether: the harm caused was physical as opposed to economic," therefore weighs in favor of high reprehensibility. The second factor, "whether . . . the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others" (*ibid.*), also weighs in favor of high reprehensibility because the evidence shows that Philip Morris knew that many smokers would suffer death or serious injury as a result of smoking but, for pecuniary gain, sought to convince its customers and the public in general that the health concerns were unfounded.

The third reprehensibility factor, "whether . . . the target of the conduct had financial vulnerability" (*State Farm, supra,* 538 U.S. at p. 419),

ordinarily is relevant only if financial vulnerability made the target more vulnerable to the defendant's wrongful conduct or exacerbated the harm, such as where the harm caused by the defendant's conduct was economic. (See *Gore, supra*, 517 U.S. at p. 576 ["infliction of economic injury, especially when done intentionally through affirmative acts of misconduct [citation] or when the target is financially vulnerable, can warrant a substantial penalty"], cited in *State Farm, supra*, at p. 419.) The United States Supreme Court has reviewed the amount of punitive damages under the due process clause only in cases involving economic harm. (*State Farm, supra*, at p. 419 [insureds' bad faith action against an insurer]; *Gore, supra*, at p. 576 [purchaser's fraud action against a car dealer]; *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443, 462 [125 L.Ed.2d 366, 113 S.Ct. 2711] (plur. opn. by Stevens, J.) [slander of title action]; *Pacific Mutual Life Insurance Co. v. Haslip* (1991) 499 U.S. 1, 18–24 [113 L.Ed.2d 1, 111 S.Ct. 1032] [insureds' fraud action against an insurer]; see also *Cooper Industries, supra*, 532 U.S. at p. 441 [unfair competition].) We have no trouble concluding, however, that in a case involving physical harm, the physical or physiological vulnerability of the target of the defendant's conduct is an appropriate factor to consider in determining the degree of reprehensibility, particularly if the defendant deliberately exploited that vulnerability. (Cf. *Gore, supra*, 517 U.S. at p. 576.) Because the evidence shows that nicotine is an addictive drug that makes smokers highly vulnerable to rationalization of their injurious behavior, and that Philip Morris for many years and through extensive efforts deliberately exploited that vulnerability through a deceptive, broad-based publicity campaign, manipulation of the narcotic effect of nicotine in cigarettes and other means, we conclude that this factor weighs in favor of high reprehensibility.

The fourth and fifth factors are "whether . . . the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (*State Farm, supra*, 538 U.S. at p. 419.) Philip Morris's efforts to cast doubt on information concerning the adverse health effects of smoking involved repeated intentional and deliberate actions through various means and for several decades, and the evidence shows that Philip Morris intended to deceive smokers and the public in general. Bullock was only one of many smokers affected by Philip Morris's nationwide efforts to disseminate misleading information and create a false controversy concerning the adverse health effects of smoking. These factors therefore also weigh in favor of high reprehensibility.

Finally, Philip Morris earned well over $100 billion in profits, in 2009 dollars, from 1954 through the original trial date in 2002, arising in large part

from the domestic sales of tobacco products.[7] Those profits presumably resulted in no small part from Philip Morris's wrongful conduct. We therefore conclude that the vast "scale and profitability" of the course of misconduct (*Johnson, supra*, 35 Cal.4th at p. 1207) weighs in favor of high reprehensibility.

Because each of the five factors weighs in favor of high reprehensibility and in light of the vast "scale and profitability" of its actions, we conclude that Philip Morris's misconduct was extremely reprehensible.[8]

### c. *Disparity Between Actual Harm and Punitive Damages*

■ The second guidepost is that punitive damages must bear a " 'reasonable relationship' " to compensatory damages or to the actual or potential harm to the plaintiff. (*Gore, supra*, 517 U.S. at pp. 575, 580; accord, *State Farm, supra*, 538 U.S. at pp. 424–426.) "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." (*State Farm, supra*, at p. 426.)

The United States Supreme Court has consistently rejected the notion that a mathematical formula or fixed ratio defines the constitutional limit. The high court in *Gore* stated, "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," and "[i]t is appropriate . . . to reiterate our rejection of a categorical approach." (*Gore, supra*, 517 U.S. at p. 582.) Similarly, *State Farm* stated, "[w]e decline again to impose a bright-line ratio which a punitive damages award cannot exceed," and "there are no rigid benchmarks that a punitive damages award may not surpass." (*State Farm, supra*, 538 U.S. at p. 425.) *State Farm* stated further, however, "Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. . . . Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in the range of 500 to 1 [citation] or, in this case, of 145 to 1."[9] (*State Farm*, at p. 425.)

---

[7] We need not decide precisely what period of time is most relevant for these purposes or determine the specific amount of profits earned during that period of time.

[8] Another court considering essentially the same course of misconduct is in accord. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1694, 1700 [26 Cal.Rptr.3d 638] [stated that Philip Morris's conduct was " 'extremely reprehensible' " and " 'exceptionally extreme' "].)

[9] Just as the measurement of compensatory damages is inexact, the due process limitation on the amount of punitive damages also is inexact and affords considerable discretion to the trier

564

*State Farm* explained that the due process limitation is elastic, rather than rigid, and depends on the circumstances: "Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' *Ibid.*; see also *ibid.* (positing that a higher ratio *might* be necessary where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine'). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff."[10] (*State Farm, supra*, 538 U.S. at p. 425, quoting *Gore, supra*, 517 U.S. at p. 582.)

██ The California Supreme Court in *Johnson, supra*, 35 Cal.4th at page 1207, explained, "To be sure, *State Farm* requires reasonable proportionality between punitive damages and actual or potential harm to the plaintiff. But what ratio is reasonable necessarily depends on the reprehensibility of the conduct, ' "the most important indicium of the reasonableness of the award" ' (*State Farm, supra*, 538 U.S. at p. 419), which in turn is influenced by the frequency and profitability of the defendant's prior or contemporaneous similar conduct. As the high court has recognized, that a defendant has

of fact. "Measurement of damages is, of course, far from exact, a fact reflected in the high court's qualification of its single-digit presumption: only awards exceeding that level 'to a significant degree' are constitutionally suspect. (*State Farm, supra*, 538 U.S. at p. 425.) As due process does not entitle a tortfeasor to notice of the *precise* amount the state may penalize him, or her, '[t]he judicial function is to police a range, not a point' (*Mathias v. Accor Economy Lodging, Inc.* [(7th Cir. 2003)] 347 F.3d [672,] 678)." (*Simon, supra*, 35 Cal.4th at p. 1183.)

[10] The jury in *State Farm* awarded the plaintiffs $2.6 million in compensatory damages for emotional distress, reduced by the trial court to $1 million, arising from the defendant insurance company's bad faith refusal to settle an action against the plaintiffs. (*State Farm, supra*, 538 U.S. at pp. 413–415.) The jury also awarded $145 million in punitive damages. (*Id.* at p. 415.) *State Farm* stated, "[i]n the context of this case, we have no doubt that there is a presumption against an award that has a 145-to-1 ratio." (*Id.* at p. 426.) *State Farm* explained that the $1 million compensatory damages award arose from a purely economic transaction with no physical injury, and that the plaintiffs "suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them." (*Id.* at p. 426.) *State Farm* also stated that the $1 million compensatory damages award "was substantial" and "was complete compensation." (*Ibid.*) *State Farm* noted that much of the plaintiffs' emotional distress was caused by their outrage and humiliation aroused by the defendant's misconduct, and stated that damages for such emotional distress contain a "punitive element" that is duplicated in a punitive damages award. (*Ibid.*) *State Farm* concluded that the $145 million punitive damages award was arbitrary. (*Id.* at p. 429.) The court therefore reversed the judgment and remanded the matter to the Utah state court to determine the appropriate amount of punitive damages in the first instance. (*Ibid.*)

repeatedly engaged in profitable but wrongful conduct tends to show that 'strong medicine is required' to deter the conduct's further repetition. [Citations.]"

 The statement in *State Farm, supra,* 538 U.S. at page 425, that punitive damages may be limited to the amount of compensatory damages if the compensatory damages are "substantial" reflects the reality that punitive damages in the same amount as a "substantial" compensatory award will also be "substantial" and the fact that a large compensatory damages award may have a deterrent effect and reduce the need for punitive damages as a deterrent (see *Simon, supra,* 35 Cal.4th at p. 1189; *Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1106 [23 Cal.Rptr.2d 101, 858 P.2d 568]). We believe that whether punitive damages must be limited to the amount of compensatory damages, or any other amount, to satisfy due process depends on the reviewing court's consideration of the three guideposts and the defendant's financial condition, and the facts and circumstances in each case.[11] (*State Farm, supra,* 538 U.S. at pp. 418, 425; *Simon, supra,* 35 Cal.4th at pp. 1185–1186.) In our view, nothing in *State Farm* suggests otherwise. Specifically, nothing in *State Farm* suggests that the high court, while declining to impose a bright-line limit in other cases, imposed the amount of compensatory damages as a bright-line limit in cases where the compensatory damages are "substantial."

The California Supreme Court in *Simon, supra,* 35 Cal.4th at page 1182, stated that *State Farm, supra,* 538 U.S. 408, established "a type of presumption" that ratios significantly greater than a single-digit ratio violate due process absent a special justification.[12] *Simon* cited "extreme reprehensibility" as one example of a circumstance that can justify a ratio significantly greater than single digits.[13] (*Simon, supra,* at p. 1182.)

---

[11] Because the state's legitimate interests in punishment and deterrence are not served if the amount of punitive damages is so small relative to the defendant's wealth as to constitute only a nuisance or a routine cost of doing business (*Simon, supra,* 35 Cal.4th at p. 1185), and because a punitive damages award violates due process only if the award is " ' "grossly excessive" in relation to these interests' " (*ibid.,* quoting *Gore, supra,* 517 U.S. at p. 568), we believe that whether the compensatory damages are "small" or "substantial" within the meaning of *State Farm, supra,* 538 U.S. at page 425, depends, in substantial part, on the defendant's financial condition.

[12] *Simon* rejected the notion that " 'in the usual case' " ratios greater than four to one are presumptively invalid and disapproved the statement in *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1057 [135 Cal.Rptr.2d 736], to that effect. (*Simon, supra,* 35 Cal.4th at pp. 1182–1183.)

[13] The plaintiff in *Simon* was awarded $5,000 in compensatory damages for promissory fraud arising from his attempt to purchase an office building from the defendant, and was awarded $1.7 million in punitive damages. (*Simon, supra,* 35 Cal.4th at p. 1166.) *Simon* stated that the reprehensibility of the defendant's conduct was "relatively low" and that $1.7 million

*Simon* stated, "We understand the court's statement in *State Farm* that 'few awards' significantly exceeding a single-digit ratio will satisfy due process to establish a type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause. [Fn. omitted.]" (*Simon, supra,* 35 Cal.4th at p. 1182.) *Simon* stated further, "In *State Farm,* the high court made clear that due process permits a higher ratio between punitive damages and a small compensatory award for purely economic damages containing no punitive element than between punitive damages and a substantial compensatory award for emotional distress; the latter may be based in part on indignation at the defendant's act and may be so large as to serve, itself, as a deterrent. (*State Farm, supra,* 538 U.S. at pp. 425–426.)" (*Id.* at p. 1189.)

*State Farm, supra,* 538 U.S. at page 425, stated that a ratio greater than those previously upheld by the high court may be appropriate "where 'a particularly egregious act has resulted in only a small amount of economic damages.' " *Simon, supra,* 35 Cal.4th at page 1182, in contrast, stated in the disjunctive that "extreme reprehensibility or unusually small . . . compensatory damages" may justify a ratio in excess of 9 or 10 to 1. *Simon* is consistent with the view that *State Farm, supra,* 538 U.S. at page 425, identified only some of the circumstances that may justify a punitive damages award significantly in excess of a single-digit ratio and did not set forth an exclusive list. (See *Hamlin v. Hampton Lumber Mills, Inc.* (2011) 349 Or. 526 [246 P.3d 1121, 1126–1127]; *Seltzer v. Morton* (2007) 336 Mont. 225 [154 P.3d 561, 611, fn. 30].) In any event, we believe that relative to Philip Morris's financial condition, $850,000 in compensatory damages is a small amount. We therefore conclude that "where 'a particularly egregious act has resulted in only a small amount of economic damages' " (*State Farm, supra,* 538 U.S. at p. 425) accurately describes the situation here.

The ratio of punitive damages to compensatory damages here is approximately 16 to 1. The $850,000 compensatory damages award includes $100,000 for pain and suffering experienced by Bullock for approximately two years from the time of her diagnosis with lung cancer until she succumbed to her physical injuries and died in February 2003. Unlike the situation where the plaintiff is awarded a generous amount for emotional distress arising from economic harm with no physical injury (*State Farm, supra,* 538 U.S. at p. 426 [$1 million awarded for 18 months of emotional

in punitive damages, 340 times the compensatory award, was " 'breathtaking' " and "far outside the 'single digit neighborhood' [citation] suggested by the high court in *State Farm.*" (*Id.* at p. 1183.)

distress arising from purely economic harm]; *Roby v. McKesson Corp., supra,* 47 Cal.4th at p. 718 [$1.3 million in noneconomic damages awarded for employment discrimination and harassment]), neither the circumstances here nor the amount of the emotional distress damages suggests that those damages reflect either Bullock's outrage and humiliation or the jury's indignation at Philip Morris's conduct.[14] We therefore have no reason to believe that the compensatory damages contain any significant punitive element.

*Boeken v. Philip Morris, Inc., supra,* 127 Cal.App.4th 1640, involved the same defendant, same theories of recovery and much of the same conduct as this case. As in this case, the plaintiff in *Boeken* began smoking in the 1950's, was diagnosed with lung cancer over 40 years later and died after the conclusion of trial. (*Id.* at p. 1649 & fn. 1.) The jury awarded Boeken $5,539,127 in compensatory damages and $3 billion in punitive damages. (*Id.* at p. 1650.) The trial court conditionally granted Philip Morris's new trial motion unless Boeken agreed to reduce the punitive damages award to $100 million. Boeken consented to the reduction. (*Ibid.*) On appeal, Division Four of the Second District Court of Appeal held that the $100 million punitive damages award was excessive. *Boeken* concluded that no more than a single-digit multiplier was justified and reduced the award to $50 million, a ratio of 9 to 1. (*Id.* at p. 1703.)

*Boeken* cited the holding in *Diamond Woodworks, Inc. v. Argonaut Ins. Co., supra,* 109 Cal.App.4th at page 1057, that in an unexceptional fraud case where the conduct was not exceptionally extreme, the constitutional limit was a ratio of four to one. (*Boeken v. Philip Morris, Inc., supra,* 127 Cal.App.4th at p. 1701.) *Boeken* also cited the holding in *Bardis v. Oates* (2004) 119 Cal.App.4th 1, 26 [14 Cal.Rptr.3d 89], limiting the ratio to 9 to 1 in a case where the damages suffered by the plaintiff were small compared to the seriousness of the defendant's conduct but the plaintiff suffered no physical injury or death. (*Boeken, supra,* at p. 1701.) *Boeken* noted that some of the facts in *Diamond Woodworks* and *Bardis* were distinguishable from the facts in *Boeken,* but cited both opinions with approval. (*Ibid.*) The *Boeken* court did not have the benefit of the later opinion in *Simon, supra,* 35 Cal.4th at pages 1182–1183, in which the California Supreme Court disapproved the

---

[14] *State Farm, supra,* 538 U.S. at page 426, noted that the plaintiffs suffered purely economic injuries, stated that much of their emotional distress was caused by their "outrage and humiliation" at their mistreatment and that "it is a major role of punitive damages to condemn such conduct," and concluded that the damages awarded for emotional distress were duplicated in part in the punitive damages award. Similarly, *Roby v. McKesson Corp., supra,* 47 Cal.4th at page 718, stated that the $1.3 million award for noneconomic damages "may have reflected the jury's indignation at [the defendant employer's] conduct, thus including a punitive component." Here, in contrast, Bullock suffered physical injuries that resulted in pain and suffering separate and apart from the outrage and indignation reflected in the punitive damages award.

rule from *Diamond Woodworks* and stated that "extreme reprehensibility" is a special justification that can overcome the presumption against an award significantly exceeding a single-digit ratio.

*Boeken v. Philip Morris, Inc., supra*, 127 Cal.App.4th 1640, ordered a $50 million punitive damages award for the same course of conduct at issue here. That award was significantly greater than the $13.8 million awarded in this case. To this extent, *Boeken* is consistent with the view that the punitive damages award in this case is reasonable. Because the $5,539,127 compensatory damages award in *Boeken* was significantly greater than the $850,000 award in this case, a lesser multiple of compensatory damages in that case was required to further the state's interests in punishment and deterrence relating to the same course of conduct at issue here. For this reason, and in light of *Simon, supra*, 35 Cal.4th at pages 1182–1183, the conclusion in *Boeken* that a ratio of 9 to 1 was the constitutional maximum in that case does not suggest that the same is true in this case.

Philip Morris cites *Exxon Shipping Co. v. Baker* (2008) 554 U.S. 471 [171 L.Ed.2d 570, 128 S.Ct. 2605] (*Exxon Shipping*) for the proposition that a ratio of 1 to 1 would be appropriate here in light of Bullock's "substantial" compensatory damages award. *Exxon Shipping* involved a massive oil spill from a tanker that ran aground off the Alaskan coast. (*Id.* at p. 478.) Several civil actions against the shipowner and others were consolidated in a class action. (*Id.* at p. 479.) Some of the claims were settled, and the jury awarded compensatory damages and $5 billion in punitive damages against the shipowner. (*Id.* at pp. 480–481.) The trial court found that the total actual harm resulting from the spill was $507.5 million, including compensatory damages awarded by the jury in the class action, compensatory damages awarded in other actions arising from the spill, settlement payments and other amounts. (*In re Exxon Valdez* (D.Alaska 2002) 236 F.Supp.2d 1043, 1058–1060.) The high court presumed that $507.5 million was the total amount of compensatory damages for purposes of its analysis. (*Exxon Shipping, supra*, at p. 515.)

The United States Supreme Court in *Exxon Shipping* reviewed the $5 billion punitive damages award under federal maritime common law and did not decide the maximum amount that would satisfy due process. (*Exxon Shipping, supra*, 554 U.S. at pp. 501–502.)[15] Unlike a constitutional due process inquiry where the high court has expressly declined to impose "a

---

[15] "Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard." (*Exxon Shipping, supra*, 554 U.S. at pp. 501–502.)

bright-line ratio" or other "rigid benchmark" (*State Farm, supra*, 538 U.S. at p. 425), the high court in *Exxon Shipping* acting as a common law court of last resort imposed a fixed ratio of 1 to 1 as the upper limit for punitive damages in federal maritime cases (*Exxon Shipping, supra*, at p. 513). *Exxon Shipping* also stated: "And our explanation of the constitutional upper limit confirms that the 1:1 ratio is not too low. In *State Farm*, we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and '[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.' [Citation.]" (*Id.* at pp. 514–515.) *Exxon Shipping* then stated in dictum that, in light of the "substantial" compensatory damages of approximately "$500 million" in that case, "the constitutional outer limit may well be 1:1." (*Id.* at p. 515, fn. 28.)

*Exxon Shipping, supra*, 554 U.S. 471, did not signal any departure from the standards articulated in *State Farm, supra*, 538 U.S. 438. Although *Exxon Shipping* suggested that the constitutional limit in that case "may well be 1:1," we believe that this merely reflected the enormity of the compensatory damages award and the high court's view that $507.5 million in punitive damages might be the most that would be constitutionally justified in light of the facts and circumstances of that case. We note that the defendant in *Exxon Shipping* was reckless, there was no finding of intentional misconduct (*Exxon Shipping, supra*, at p. 480 & fn. 2) and the high court did not characterize the conduct as highly reprehensible, let alone extremely reprehensible. "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm, supra*, 538 U.S. at p. 425.)

Citing awards in other cases in California and nationwide, Philip Morris argues that there is an emerging consensus that "six-figure damage awards are more than 'substantial' enough to trigger this 1:1 upper limit." We cannot discern any emerging consensus in this regard relevant to the extremely reprehensible conduct at issue in this case. Moreover, we do not regard the amount of compensatory damages as a fixed upper limit where damages are "substantial," as we have stated.[16] Instead, the constitutional limit depends on the facts and circumstances of each case. (*State Farm, supra*, 538 U.S. at p. 425.) Philip Morris also cites opinions holding that some other single-digit ratio greater than one to one was the constitutional maximum in each case. We need not attempt to reconcile the 16-to-1 ratio in this case with other opinions holding, in the particular circumstances of each case, that the punitive damages award was constitutionally excessive. Absent a bright-line maximum ratio, some variation is to be expected.

---

[16] In any event, we do not consider $850,000 in compensatory damages to be "substantial," within the meaning of *State Farm, supra*, 538 U.S. at page 425, in these circumstances.

### d. *Civil Penalties Authorized in Comparable Cases*

■ *Simon* stated that the third guidepost, civil penalties for comparable misconduct, "is less useful in a case like this one, where plaintiff prevailed only on a cause of action involving 'common law tort duties that do not lend themselves to a comparison with statutory penalties' [citation]."[17] (*Simon, supra,* 35 Cal.4th at pp. 1183–1184.) We are aware of no statutory penalty for misconduct that is comparable in a meaningful way to the misconduct at issue here. (*Boeken v. Philip Morris, supra,* 127 Cal.App.4th at p. 1700.) The third guidepost therefore plays no significant role in our analysis. (*Simon, supra,* at pp. 1183–1184.)

### e. *Financial Condition*

■ The defendant's financial condition remains an essential consideration under California law and a permissible consideration under the due process clause in determining the amount of punitive damages necessary to further the state's legitimate interests in punishment and deterrence. (*State Farm, supra,* 538 U.S. at p. 428 [stating that consideration of the defendant's wealth as a factor is not " 'unlawful or inappropriate' "]; *Simon, supra,* 35 Cal.4th at p. 1185.) Those interests are not served if the amount awarded is so small in relation to the defendant's wealth as to constitute only a nuisance or a routine cost of doing business. (*Simon, supra,* at p. 1185.) An award violates due process in light of the defendant's financial condition only if the award is " ' "grossly excessive" in relation to these interests.' " (*Ibid.,* quoting *Gore, supra,* 517 U.S. at p. 568; see also *State Farm, supra,* 538 U.S. at p. 427 ["[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award"].) The defendant's financial condition cannot supplant the three guideposts in evaluating the amount of punitive damages under the due process clause, but the defendant's financial condition can supplement the guideposts as an additional consideration. (*Simon, supra,* 35 Cal.4th at pp. 1185–1186.) "The *BMW/State Farm* guideposts cannot be abandoned or ignored, but in determining whether a lesser award 'could have satisfied the State's legitimate objectives' (*State Farm, supra,* 538 U.S. at p. 420), a reviewing court may nonetheless give some consideration to the defendant's financial condition. [Fn. omitted.]" (*Id.* at p. 1186.) *Simon* stated that in some cases the defendant's financial condition considered together with the three guideposts may justify a ratio significantly in excess of a single-digit ratio (*id.* at p. 1186), while in other cases, "the state may have to partly yield its goals of punishment and deterrence to the federal requirement that an award stay within the limits of due process" (*id.* at p. 1187).

---

[17] *State Farm* discussed the third guidepost, civil penalties for comparable misconduct, only briefly, stating that the most relevant civil sanction was a $10,000 fine for an act of fraud, "an amount dwarfed by the $145 million punitive damages award." (*State Farm, supra,* 538 U.S. at p. 428.)

California's interests in punishment and deterrence are very strong in light of the extreme reprehensibility of Philip Morris's misconduct. Moreover, Philip Morris's persistent efforts for several decades to mislead the public about the health hazards of smoking despite its understanding that smoking was hazardous show that "strong medicine is required to cure the defendant's disrespect for the law." (*Gore, supra,* 517 U.S. at pp. 576–577.) Although there was some evidence of Philip Morris's profits, discussed *ante,* the best indication of its financial condition and ability to pay is the admission by its counsel that Philip Morris "has billions of dollars in profits; and there's no debate, no dispute, that Philip Morris could afford to pay a billion dollars or $6.666 billion in this case." Philip Morris's considerable wealth and ability to pay many times the amount awarded suggest that the $13.8 million punitive damages award is not excessive.

### f. *Other Considerations*

Philip Morris contends its obligations under the MSA, the recently enhanced federal regulation of the tobacco industry and other circumstances reduce the need for punishment and deterrence. Philip Morris argues that its substantial and continuing payment obligations under the agreement and the MSA's prohibition of some of the same types of conduct on which its liability in this case is based serve as deterrents to future misconduct.

Bullock and Philip Morris stipulated that the MSA "provides for payments to the states for reimbursement of funds spent on health care costs of individuals, among other things" and that the MSA "does not provide any payments to individuals and does not provide any payments for punitive damages." The substantial payments under the MSA reflect the substantial damages to the states allegedly caused by the cigarette manufacturers, and are by no means a measure of punishment. In any event, we need not decide whether, or the extent to which, settlement payments for compensatory damages generally may reduce the need for punishment or deterrence and limit the amount of punitive damages that otherwise would be constitutionally permissible because the evidence in this case suggests that the MSA has no meaningful deterrent effect on Philip Morris and others and is not an effective punishment.

Bullock's forensic economics expert testified at trial that Philip Morris's revenues and profits actually increased markedly (revenues increased by $4.3 billion in 1999 alone) due to increased cigarette prices as a result of the MSA. As *Boeken v. Philip Morris, Inc., supra,* 127 Cal.App.4th at page 1703, explained, "Philip Morris may simply absorb the cost by raising prices without any competitive disadvantage because the other participants are likely to do the same, and if so, there may be no punitive or deterrent effect as a

result of the payments required under the MSA." Commentators have stated that the MSA is designed to allow the participating cigarette manufacturers to increase prices so as to pass the costs of the settlement on to consumers. (DeBow, *The State Tobacco Litigation and the Separation of Powers in State Governments: Repairing the Damage* (2001) 31 Seton Hall L.Rev. 563, 569; O'Brien, *Constitutional and Antitrust Violations of the Multistate Tobacco Settlement* (2000) CATO Policy Analysis No. 371, pp. 2–5.) We conclude that Philip Morris's payment obligation, its commitment under the terms of the MSA not to engage in certain conduct and the recently enhanced federal regulation of the tobacco industry are neither punishment nor an effective deterrent to others who would engage in similar misconduct and neither reduce the need for punitive damages nor limit the amount that may be awarded.

Philip Morris also argues that the conduct that harmed Bullock was undertaken decades ago by individuals who are no longer associated with the company and that its current employees and shareholders do not deserve to be punished. Philip Morris argues that it "is effectively a different company from the one whose conduct was at issue in this case," and that it now is subject to regulations and other constraints that did not exist in previous years. Philip Morris argues further that the evidence shows that it is "committed to change" and that it "has neither the inclination nor the capacity to repeat the misconduct that gave rise to this case."

Although these arguments might have persuaded the jury to award a more moderate amount than was awarded in the original trial, they do not compel the conclusion that the $13.8 million award is grossly excessive in relation to California's legitimate interests in punishment and deterrence.

Finally, the Civil Justice Association of California as amicus curiae argues that prior awards of punitive and compensatory damages against Philip Morris for the same course of conduct are relevant to the amount of punitive damages necessary to deter and punish in this case. (See *Boeken v. Philip Morris, Inc., supra*, 127 Cal.App.4th at p. 1701; *Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1661 [57 Cal.Rptr.2d 525].) Philip Morris, however, presented no evidence at trial of any prior awards and does not argue this point on appeal. An amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae. (*Costa v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1177, 1187–1188 [77 Cal.Rptr.2d 289].) We therefore decline to address this issue.

### g. *Conclusion*

 We believe that the extreme reprehensibility of Philip Morris's misconduct, including the vast scale and profitability of its course of misconduct, and its financial condition justify the $13.8 million punitive damages award against Philip Morris. Our conclusion is the same regardless of whether the ratio of 16 to 1 can be said to *significantly* exceed a single-digit ratio, so we need not decide that question.[18] We do not mean to suggest that 16 to 1 would be an appropriate ratio in another case involving extreme reprehensibility or to establish any kind of presumption, but merely conclude, based on the facts in this case, that the $13.8 million punitive damages award is reasonable, not arbitrary, and does not offend due process.

### 3. *The Award of Prejudgment Interest Was Proper*

Civil Code section 3287, subdivision (a) states, "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. . . ."

 Civil Code section 3287, subdivision (a) provides that a party may recover prejudgment interest on an amount awarded as damages from the date that the amount was both (1) due and owing and (2) certain or capable of being made certain by calculation. (*Koyer v. Detroit F. & M. Ins. Co.* (1937) 9 Cal.2d 336, 345 [70 P.2d 927]; *Gray v. Bekins* (1921) 186 Cal. 389, 399 [199 P. 767].) The primary purpose of an award of prejudgment interest is to compensate the plaintiff for the loss of use of money during the period before the entry of judgment, in order to make the plaintiff whole. (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 663 [25 Cal.Rptr.2d 109, 863 P.2d 179]; *Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 71–72 [108 Cal.Rptr.2d 715].) Absent a statutory provision specifically governing the type of claim at issue, the prejudgment interest rate is 7 percent under article XV, section 1 of the California Constitution. (*Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585 [36 Cal.Rptr.2d 343].)

 Damages are certain or capable of being made certain by calculation, or ascertainable, for purposes of Civil Code section 3287, subdivision (a) if the defendant actually knows the amount of damages or could compute that

---

[18] "[T]he presumption of unconstitutionality applies only to awards exceeding the single-digit level 'to a significant degree.' (*State Farm, supra*, 538 U.S. at p. 425.)" (*Simon, supra*, 35 Cal.4th at p. 1182, fn. 7.)

amount from readily available information. (*KGM Harvesting Co. v. Fresh Network* (1995) 36 Cal.App.4th 376, 391 [42 Cal.Rptr.2d 286].) In contrast, damages that must be determined by the trier of fact based on conflicting evidence are not ascertainable. (*Lineman v. Schmid* (1948) 32 Cal.2d 204, 212 [195 P.2d 408]; *Fireman's Fund Ins. Co. v. Allstate Ins. Co.* (1991) 234 Cal.App.3d 1154, 1172–1173 [286 Cal.Rptr. 146].)

Damages determined by a verdict are made certain as of the date that the verdict is entered, so prejudgment interest begins to accrue on that date. (*Holdgrafer v. Unocal Corp.* (2008) 160 Cal.App.4th 907, 935 [73 Cal.Rptr.3d 216]; cf. *Britz, Inc. v. Alfa-Laval Food & Dairy Co.* (1995) 34 Cal.App.4th 1085, 1106 [40 Cal.Rptr.2d 700] [damages made certain by an arbitrator's award].) A legal dispute as to the plaintiff's entitlement to the amount awarded does not render the damages uncertain. (*Olson v. Cory* (1983) 35 Cal.3d 390, 402 [197 Cal.Rptr. 843, 673 P.2d 720].) Rule 3.1802 of the California Rules of Court properly requires the clerk to "include in the judgment any interest awarded by the court and the interest accrued since the entry of the verdict." Contrary to Philip Morris's argument, Civil Code section 3287, subdivision (a) does not distinguish between compensatory and punitive damages and applies equally to both. We conclude that the trial court properly awarded prejudgment interest on the punitive damages award from the date of the verdict.

## DISPOSITION

The judgment and order awarding prejudgment interest are affirmed. Bullock is entitled to recover her costs on appeal.

Klein, P. J., concurred.

**KITCHING, J.,** Dissenting.—In *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*), the United States Supreme Court addressed the circumstances under which an award of punitive damages violates the due process clause of the Fourteenth Amendment to the Constitution of the United States. A key component of the court's analysis was the ratio between punitive and compensatory damages. Although the court declined to impose a bright-line rule, it stated that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*State Farm*, at p. 425.) Later, in *Exxon Shipping Co. v. Baker* (2008) 554 U.S. 471, 507 [171 L.Ed.2d 570, 128 S.Ct. 2605], the high court reiterated that the ratio between punitive and compensatory damages is "a central feature in [its] due process analysis."

The majority in this case has affirmed an award of $13.8 million in punitive damages and $850,000 in compensatory damages. This is a ratio of more than 16 to 1. As I will explain, however, because plaintiff was awarded substantial compensatory damages, the ratio of punitive to compensatory damages cannot to a significant degree exceed a single-digit ratio. The award in this case does that.

Under *State Farm* and its progeny, the punitive damages award constitutes excessive punishment in violation of the due process clause. *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640 [26 Cal.Rptr.3d 638] (*Boeken*), which I shall discuss *post*, is directly on point and involved the same defendant and facts strikingly similar to this case. There, the court held that the plaintiff was entitled to recover punitive damages no greater than a 9-to-1 ratio. (*Id.* at p. 1703.) I would do the same here. I therefore dissent from the portion of the majority opinion that affirms the punitive damages award.[1]

In *State Farm*, the Supreme Court applied three guideposts set forth in *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 [134 L.Ed.2d 809, 116 S.Ct. 1589], for determining whether an award of punitive damages violates the constitutional right to due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra*, 538 U.S. at p. 418.)

As to the first guidepost, I agree with the majority that the conduct of Philip Morris USA, Inc., was highly reprehensible and more egregious than other conduct that would support an award of punitive damages. As to the third guidepost, I agree with the opinion that "[w]e are aware of no statutory penalty for misconduct that is comparable in a meaningful way to the misconduct at issue here." (Maj. opn., *ante*, at p. 570.) The third guidepost, therefore, plays no role in my conclusion that the punitive damages award of $13.8 million in this case violates due process.

The second *State Farm* guidepost is the ratio of punitive to compensatory damages. As to this guidepost, the *State Farm* court explained that "courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." (*State Farm, supra*, 538 U.S. at p. 426.) The court noted that

---

[1] I otherwise agree with the remainder of the majority opinion's discussion, including the part relating to prejudgment interest. I would, nonetheless, reverse the trial court's order awarding prejudgment interest because it is based on an award of punitive damages that violates defendant Philip Morris's due process rights.

statutes dating back centuries have imposed ratios of 2 to 1, 3 to 1 and 4 to 1, and that these ratios are "instructive." (*Id.* at p. 425.) Most importantly, as I stated earlier, the court opined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." (*Ibid.*)

Interpreting this latter statement, the California Supreme Court held in *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*) that ratios significantly greater than 9 or 10 to 1 are "presumptively" invalid. (*Id.* at p. 1182.) The court further explained: "Multipliers *less* than nine or 10 are not, however, presumptively *valid* under *State Farm.* Especially when the compensatory damages are substantial or already contain a punitive element, lesser ratios 'can reach the outermost limit of the due process guarantee.' " (*Ibid.*, citing *State Farm, supra,* 538 U.S. at p. 425.)

Both *State Farm* and *Simon* recognized a few limited exceptions to the single-digit ratio limit. The only one potentially applicable in this case is where the compensatory damages consist of a "small" (i.e., not "substantial") amount and defendant's conduct is "highly" or "extremely" reprehensible (i.e., "particularly egregious").[2] (See *State Farm, supra,* 538 U.S. at p. 425–426; *Simon, supra,* 35 Cal.4th at pp. 1182–1183.)

In *State Farm*, the court explained this exception as follows: "[B]ecause there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Citations.] The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm, supra,* 538 U.S. at p. 425.)

In *Simon*, the California Supreme Court also addressed this exception. The court initially touched upon the exception in passing by stating: "[R]atios between the punitive damages award and the plaintiff's actual or potential

---

[2] A higher ratio might also be permissible where " 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine' " (*State Farm, supra,* 538 U.S. at p. 425; accord, *Simon, supra,* 35 Cal.4th at p. 1182). Additionally, the *potential* harm caused by the defendant's conduct that was likely to occur, but did not, can also be considered in the due process analysis. (*Simon,* at pp. 1177–1178; *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443, 459–460 [125 L.Ed.2d 366, 113 S.Ct. 2711]; *State Farm,* at pp. 424–425.)

compensatory damages significantly greater than 9 or 10 to 1 are suspect, and *absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages)*, cannot survive appellate scrutiny under the due process clause." (*Simon, supra*, 35 Cal.4th at p. 1182, italics added.) By listing examples of the exceptions to the single-digit limit in the disjunctive, the court ostensibly opined that both a finding of "extreme reprehensibility" and an award of a "small amount" of compensatory damages are separate, independent exceptions. I do not believe the court so held for at least two reasons.

The first is that when *Simon* actually discussed the exception it quoted *State Farm*. The *Simon* court held: "Nor can the 340-to-1 ratio here be justified on the ground that ' "a particularly egregious act has resulted in only a small amount of economic damages." ' " (*Simon, supra*, 35 Cal.4th at p. 1183, italics omitted, quoting *State Farm, supra*, 538 U.S. at p. 425.) This description of the exception is not in the disjunctive.

Moreover, the *Simon* court did not apply "extreme reprehensibility" and "small amount" of damages as separate exceptions. In *Simon*, the amount of compensatory damages was $5,000 (*Simon, supra*, 35 Cal.4th at p. 1166), which the court found to be "quite small" (*id.* at p. 1189). The defendant's conduct, however, was "not highly reprehensible" when compared to conduct in other punitive damages cases. (*Id.* at p. 1183.) The court thus held that "[t]he nature and size of the compensatory award here . . . militates for a maximum award at the top of, but not significantly beyond, the single-digit range." (*Id.* at p. 1189.) The court reversed a $1.7 million punitive damages award and limited the plaintiff's punitive damages to $50,000, which is a 10-to-1 ratio. (*Ibid.*)

Had the *Simon* court held that a small amount of damages was an independent exception to the single-digit ratio limit, the case would have gone the other way. The plaintiff could have recovered punitive damages in an amount more than 10 times the amount of the compensatory award because the compensatory damages were small. The implication of *Simon*, therefore, is that either an award of a small amount of damages or a finding of high reprehensibility is not enough, by itself, to justify an exception to the single-digit limit. At a minimum, *Simon* holds that the two components must be viewed together for purposes of the ratio guidepost.

This interpretation of the small-damages-high-reprehensibility exception was applied in *Planned Parent v. Coalition, Life Activists* (9th Cir. 2005) 422 F.3d 949 (*Planned Parenthood*). In *Planned Parenthood*, the defendants engaged in a " 'campaign of terror and intimidation' " designed to prevent the plaintiffs from providing abortion services. (*Id.* at p. 952.) Although the court

found the defendants' conduct was on the "high side of reprehensibility" (*id.* at p. 959), it also found that most of the compensatory awards were "substantial" (*id.* at p. 963). The court thus limited the plaintiffs' punitive damages to a single-digit ratio. (*Ibid.*)

*Planned Parenthood* is consistent with my interpretation of *State Farm* and *Simon*. Even when the defendant's conduct is highly reprehensible, if the compensatory damages are substantial, an award exceeding a single-digit ratio between punitive and compensatory damages to a significant degree violates due process, unless another exception applies.

In this case, the jury awarded Jodie Bullock $850,000 in compensatory damages. This was a substantial compensatory award. Although Philip Morris's conduct was highly reprehensible, under both *State Farm* and *Simon*, a punitive damages award in the amount of $13.8 million does not comport with due process because it exceeds a single-digit ratio to a significant degree.

The majority states "relative to Philip Morris's financial condition, $850,000 in compensatory damages is a small amount." (Maj. opn., *ante*, at p. 566.) disagree with this analysis. Defendant's financial condition is irrelevant to the issue of whether a compensatory award is "small" or "substantial" for purposes of the ratio guidepost.[3] The majority cites no authority to support its view to the contrary.

I recognize that drawing a line between small and substantial damages for purposes of determining whether an award of punitive damages can exceed the single-digit ratio limit is not an easy task. The $850,000 award in this case, however, clearly falls in the substantial damages category. The *State Farm* court held that a $1 million compensatory award was substantial. (*State Farm, supra,* 538 U.S. at p. 426.) The compensatory award here is not materially less.

In *Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204 [40 Cal.Rptr.3d 92], the court held that compensatory damages ranging from $75,000 to $50,000 could not be characterized as "nominal," and thus a ratio of more than 6 to 1 could not be justified. (*Id.* at pp. 222, 224.) Likewise, numerous courts in other jurisdictions have held that awards considerably less than $850,000 were substantial for purposes of determining whether an exception to the single-digit ratio limit applies. (See, e.g., *Bains LLC v. Arco Products Co.* (9th Cir. 2005) 405 F.3d 764, 776 [$50,000]; *Bridgeport Music,*

---

[3] Although a defendant's wealth is a legitimate consideration, it cannot justify punitive damages unconstitutionally disproportionate to compensatory damages (*State Farm, supra,* 538 U.S. at pp. 427–428) or "substitute for the high court's guideposts in limiting awards" (*Simon, supra,* 35 Cal.4th at p. 1186).

*Inc. v. Justin Combs Publishing* (6th Cir. 2007) 507 F.3d 470, 489 [$366,939]; *Bach v. First Union National Bank* (6th Cir. 2007) 486 F.3d 150, 156–157 [$400,000]; *CGB Occupational Therapy v. RHA Health Services* (3d Cir. 2007) 499 F.3d 184, 192–193 [$109,000]; *Quigley v. Winter* (8th Cir. 2010) 598 F.3d 938, 955 [$13,685]; *Wallace v. DTG Operations, Inc*. (8th Cir. 2009) 563 F.3d 357, 362 [$30,000].) The majority does not cite a single case that indicates $850,000 or an award anywhere close to that amount is not substantial.

In its discussion of the ratio guidepost, the majority states that "[w]e . . . have no reason to believe that [Bullock's] compensatory damages contain any significant punitive element." (Maj. opn., *ante*, at p. 567.) I agree. That conclusion, however, does not justify exceeding the single-digit ratio limit.

In *State Farm*, the court noted that sometimes compensatory damages have a punitive element because they include compensation for emotional distress caused by humiliation or indignation aroused by the defendant's conduct. (*State Farm, supra*, 538 U.S. at p. 426.) When that occurs punitive damages are somewhat duplicative. (*Ibid*.) The *State Farm* court held that in such situations a lower ratio can be justified. (*Ibid*.) It did not hold, however, that the absence of a punitive element in the compensatory award permits an exception to the single-digit ratio limit.

It is important to keep in mind that where, as here, the compensatory award is substantial, a ratio of 1 to 1 "can reach the outermost limit of the due process guarantee." (*State Farm, supra*, 538 U.S. at p. 425.) The significance of the absence of a punitive element in the compensatory award is that the ratio can be higher within a constitutionally permissible range. Other factors, such as the reprehensibility of the defendant's conduct and the defendant's wealth can also increase the ratio up to, but not exceeding to a significant degree, a single-digit ratio, unless one of the limited exceptions described in *State Farm* applies. In this case, because there is no punitive element in the compensatory award and in light of Philip Morris's highly reprehensible conduct and great wealth, punitive damages in the top end of that range are justified.

The present case is identical in all material respects to *Boeken*. As the majority in this case concedes, the *Boeken* case involved the same defendant, the same causes of action, the same counsel, and virtually the same conduct. The jury in *Boeken* awarded the plaintiff $5,539,127 in compensatory damages and $3 billion in punitive damages, which was reduced by the trial court to $100 million. The Court of Appeal, however, held that the plaintiff was entitled to no more than a single-digit ratio of punitive damages in

comparison to compensatory damages. (*Boeken, supra*, 127 Cal.App.4th at p. 1703.) The court thus reduced the plaintiff's punitive damages to $50 million, which is about a 9 to 1 ratio. (*Ibid.*) I see no reason why we should not do the same here.

The majority attempts to distinguish *Boeken* by noting that the *Boeken* court cited *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020 [135 Cal.Rptr.2d 736] (*Diamond Woodworks*), which was disapproved of in *Simon, supra*, 35 Cal.4th at pages 1182–1183. In *Simon*, the California Supreme Court stated "we do not agree with the court in [*Diamond Woodworks*], that 'in the usual case' the high court's decisions establish an 'outer constitutional limit' of approximately *four* times the compensatory damages." (*Simon*, at pp. 1182–1183.) *Boeken*'s reference to *Diamond Woodworks* is inconsequential because the *Boeken* court did not rely on or apply the part of *Diamond Woodworks* disapproved of in *Simon*, namely a 4-to-1 ratio limit "in the usual case."

The majority also states that *Boeken* is distinguishable because the *Boeken* court did not have the benefit of *Simon*, which was subsequently published. There is nothing in *Boeken*, however, that is inconsistent with *Simon*. *Simon* simply applied *State Farm* to the facts in that case. It did not, of course, alter *State Farm*'s holding regarding federal due process limitations on punitive damages. With respect to the ratio guidepost, *Boeken* relied heavily on *State Farm* (*Boeken, supra*, 127 Cal.App.4th at pp. 1695–1696), and there is no reason to believe that the *Boeken* court would have decided the case differently in the wake of *Simon*.

Finally, the majority argues: "Because the $5,539,127 compensatory damages award in *Boeken* was significantly greater than the $850,000 award in this case, a lesser multiple of compensatory damages in that case was required to further the state's interests in punishment and deterrence relating to the same course of conduct at issue here." (Maj. opn., *ante*, at p. 568.) I disagree.

For purposes of the ratio guidepost, the compensatory award in this case is not materially different from the one in *Boeken* because both awards are substantial. The purpose of the ratio guidepost is to ensure that punitive damages are "reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." (*State Farm, supra*, 538 U.S. at p. 426.) Thus the only significance of the greater compensatory award in *Boeken* is that the outer constitutional limit of the *gross amount* of punitive damages there (i.e., $50 million) is higher than it is here. This does not mean that the *ratio* of punitive to compensatory damages can be higher. Accordingly, a $50 million punitive damages award in *Boeken* is constitutionally

permissible, while a $13.8 million award here is not, even though Philip Morris's conduct was virtually the same in both cases, because punitive damages must be reasonably proportionate to compensatory damages.

Under *State Farm, Simon*, and *Boeken*, Bullock was entitled to no more than a single-digit ratio of punitive to compensatory damages. However, because of Philip Morris's highly reprehensible conduct and its great wealth, as well as the lack of a punitive element in the compensatory award, I conclude, like the *Boeken* court, that Bullock was entitled to an award of punitive damages at the highest end of the single-digit ratio range. (*Boeken, supra*, 127 Cal.App.4th at p. 1703.)

The $13.8 million punitive damages award exceeded, to a significant degree, a single-digit ratio in comparison to the compensatory damages, and is in violation of due process. I therefore respectfully dissent.

Appellant's petition for review by the Supreme Court was denied November 30, 2011, S196763. Kennard, J., and Chin, J., did not participate therein.