Filed 4/30/14  In re Marriage of Gennaro CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Marriage of MARK A. and TANIA S. GENNARO. | |
| MARK A. GENNARO,<br><br>    Appellant,<br><br>      v.<br><br>TANIA S. GENNARO,<br><br>    Respondent. | G047294<br><br>(Super. Ct. No. 97D009606)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Paula Coleman, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Merritt L. McKeon for Appellant.

Douglas S. Honig for Respondent.

\*          \*          \*

## I. INTRODUCTION

To be as sympathetic to appellant Mark Gennaro (Mark) as the record will allow, his appeal brings with it an air of self-inflicted wounds. Mark's central complaint in this multi-volume appeal is the injustice he suffered back in June, 2010, when, in ruling on a request to increase child support, the trial court made an order imposing issue and evidentiary sanctions on him. Those sanctions had the effect of totally defaulting him, and imposing – at least in comparison to the existing child support order – a draconian upward child support modification.

That order increased child support from $350 a month to $2,986 a month, more than a 700 percent increase. The increase was based on imputing income of $8,860 a month, which would have yielded a guideline formula award of $1,643 a month. But on top of that, the order invoked "special circumstances" to increase the amount still further to $2,986 a month – though it's not exactly clear how the court supported the extra $1,343 a month, because the court didn't spell out the special circumstances. Moreover, the child support award was also arrived at by a finding the actual time share ratio for custody of the couple's teenage son was not – as it had been going into the modification proceeding – 50-50, but rather 75-25 in favor of Mark's ex-wife Tania Gennaro Grindeman (Tania). When attorney fees of about $12,000 were included, the order created an instant liability on Mark's part, of $94,000. And the order went out of its way to mention the bankruptcy statute (11 U.S.C. § 523) which makes domestic support obligations nondischargeable in bankruptcy. The trial judge had clearly thrown the proverbial book at Mark.

But was the order *really* the result of an abuse of discretion or error in law, or both? We will never know. The order was itself a final, appealable order. And in fact Mark did appeal it. But for some reason, he abandoned *that* appeal. (The reason was a failure to designate a record.) So for purposes of this case, it's res judicata.

Which brings us to *this* appeal. This appeal is not from that order but from an order filed July 17, 2012, denying a motion seeking to set aside the earlier order. To the degree this appeal attacks the merits of the earlier order, it runs into the bar of res judicata and to the degree the motion raised its own independent reasons to set aside the order of June 17, 2010 (arguing Tania had lied about the timeshare and about an asset), there is substantial evidence supporting the trial court's decision to deny the request. So we must affirm the judgment.

## II. FACTS

Mark and Tania were married in February 1988 and divorced in October 1998. Child support was fixed at $700 a month total for the couple's two children, Michaela (born in July 1989) and Dorian (born in October 1992).

By January 2008, Michaela had just turned 18, so only Dorian, then 15 was the subject of the child support order. On January 10, 2008, the Orange County Department of Child Support Services filed a motion to revalue child support upward based on unspecific allegations there had been a change of circumstances in the interim.[1]

Almost two and a half years would pass before the family law court entered, on June 17, 2010, an order formally modifying Mark's support obligation retroactive to January 2010, the essence of which we have already described. What caused the delay? Mark had been so recalcitrant in providing information about his landscape architect business that in April 2009, which was already 15 months into the modification proceeding, a discovery referee was appointed. Even then, Tania spent the next 11 months in a fruitless discovery battle to force Mark to turn over original source documents concerning the income of his landscape architect business, including checks written to it, corporate bank statements, and – perhaps most important – the job contracts from which one might develop an accurate picture of the income of the business. During

---

[1] Why a public agency filed the motion and not Tania herself is not explained in the briefing.

3

this period of time, and up through the June 17, 2010 order, Mark was representing himself.

In a report filed March 4, 2010, the discovery referee documented Mark's failure to comply with discovery, and pointed out the discrepancies in Mark's excuses for not producing documents: On the one hand, Mark insisted the business's documents were so numerous "'it's going to take a truck to bring it here'" (the referee's report, quoting Mark directly). But, on the other hand, Mark was complaining about his lack of business, indicating he certainly should have had the time to produce its records.

The referee was particularly unimpressed with Mark's invocation of his parenting duties as an excuse not to find the time to sit "down in front of his file drawers and extract[] the documents he is duty bound to produce." The referee was also understandably irritated that Mark assumed *he* would be the ultimate arbiter of what documents he would produce. Among other things, the discovery referee recommended making Mark pay all of Tania's costs and attorney fees, imputing income to him as an "issue" sanction, and preventing him from contesting evidence of his income as an "evidentiary" sanction.

About a month after the referee's report Tania filed an income and expense declaration to the effect that the custodial time share factor involving Dorian was 75 percent her, 25 percent Mark. Then, in mid-June, the matter of the January 2008 child support modification request was finally heard, resulting in the order of June 17, 2010, already described.

Mark retained counsel for a series of postorder attacks in the trial court – a motion to vacate, a motion for new trial, and a motion to reconsider.[2] These, however, were all denied on August 23, 2010. Within the month, on September 22, with new counsel, Mark filed a notice of appeal on September 22, 2010, from the June 17, 2010

---

[2] The main reason for the voluminous heft of the appellant's appendix in this case is that these motions included a significant number of the records of Mark's business.

4

order. The appeal, however, was dismissed October 21, 2010, for failure to designate a record.[3]

Almost a year went by after Mark gave up his appeal. Then, on October 4, 2011, he filed a motion in the trial court to set aside the June 17, 2010 order, for fraud. He alleged, among other things, that Tania (1) had not been honest in listing her assets, which included an interest in a condominium in Corona Del Mar, and (2) had lied about the actual time share percentage concerning the teenage son Dorian; it hadn't been 75-25 as she told the court, but 50-50 after all. Dorian himself would eventually file a declaration (though in a response to an opposition, not part of the original motion) supporting the 50-50 version. The set aside motion asserted it was timely because the document evidencing the Corona Del Mar condo ownership hadn't been recorded until about four months previously. (Cf. Fam. Code, § 3691, subd. (b) [relief from support order timely if brought within six months of time moving party discovered or should have discovered perjury].)[4]

The set aside motion had originally been set for December 11, 2011, but was finally heard May 16, 2012. There is no reporter's transcript of the proceeding, though the hearing did involve testimony from both Mark and Tania. The court prepared and mailed a proposed statement of decision on May 25, 2012, denying the set aside motion. As to the Corona Del Mar condo, the court found that (a) the existence of the

---

[3]     The opening brief in *this* appeal hints that the reason the appeal was abandoned was that, at the time, no reporter's transcript of the hearing of July 17, 2010, was available. According to the opening brief (in a statement made without record reference) in 2010 the particular reporter who transcribed the proceeding misplaced his notes in a locked cabinet, and the notes were only discovered in January 2013.

The question arises, did Mark fail to prosecute his earlier appeal because of the unavailability of the reporter's notes in the fall of 2010 when his appeal was in the formation stage? If so, it is unfortunate. But we must note two points here:

One, even if the notes were missing, Mark still might have prosecuted his appeal by use of a settled or agreed statement. (See Cal. Rules of Court, rules 8.130(g); 8.134; 8.137.) That option was particularly viable given the shortness of the actual proceedings of June 17, 2010 – which consists of literally less than six full pages of large type transcript.

And second, more importantly, Mark presents no argument in *this* appeal that the unavailability of reporter's transcript notes in the fall of 2010 somehow renders the order of June 17, 2010, unenforceable.

[4]     All further statutory references in this opinion are to the Family Code.

5

condo had been a subject of public record since late 2009 when Tania was listed on a deed of trust filed with the recorder's office, but in any event (b) the condo was her husband's sole and separate property, since he had acquired it in 2000, long before their marriage, and merely putting her on the deed of trust as part of a 2009 refinancing did not give her an interest in it. As to the timeshare, the point had actually been raised back in the motion to reconsider the June 17, 2010 order, and so was res judicata.

It got worse for Mark. Tania had made a request to determine Mark's accumulated arrearages, which were found to be, as of May 9, 2012, $110,332.72, plus another $27,367.69, for a grand total $137,700.41. On top of that, the court found the "vast majority" of Mark's set aside motion was "seeking to re-litigate that which is *res judicata* and basically a second motion for reconsideration." As the trial court saw it, Mark was gratuitously forcing Tania to "respond and incur attorney fees and related costs in what this court finds a frivolous motion." So the proposed order added another $15,103.50 as sanctions under section 271. These orders were then repeated in a formal findings and order after hearing, file July 17, 2012. This appeal was filed August 16, 2012, from the July 17, 2012 order.

III.  DISCUSSION

Mark's appeal presents three different sets of challenges to the trial court's various orders. First there are the arguments directly attacking the order of June 17, 2010. Then there are the arguments attacking the order of July 17, 2012, denying set aside of the order of June 17, 2010. Finally, there is one argument challenging the new sanctions contained in the July 17, 2012 order.

A.  *The Order of June 17, 2010*

The June 17, 2010 order is, as the trial court in the 2012 set aside proceeding accurately recognized, res judicata. "If an order is appealable, . . . and no timely appeal is taken therefrom, the issues determined by the order are res judicata." (*In re Matthew C*. (1993) 6 Cal.4th 386, 393.) And that is precisely the rule governing the

6

June 17, 2010 order. Mark chose to abandon his appeal from the order of June 17, 2010, it is res judicata. It is – unfortunately – as simple as that.[5]

There *is* an esoteric doctrine sometimes called the "manifest injustice exception to res judicata." (See *Louie v. BFS Retail & Commercial Operations, LLC* (2009) 178 Cal.App.4th 1544, 1562 ["Of course, even assuming continuing viability of the manifest injustice exception to res judicata, that exception assumes a basis for application of res judicata exists in the first place."].) The doctrine can be traced back to a passage in *Greenfield v. Mather* (1948) 32 Cal.2d 23.[6] But the *Greenfield* case got off to a shaky start and has never recovered. Justice Traynor dissented, writing: "So cavalier a departure from res judicata throws into question the finality of any judgment and thus is bound to cause infinitely more injustice in the long run than it can conceivably avert in this case. It is an invitation to all unsuccessful litigants to relitigate their cases, for they commonly view judgments against them as erroneous and hereafter can contend with justifiable cause that their cases also present an exceptional combination of circumstances requiring a departure from the doctrine of res judicata." (*Id.* at p. 36 (dis. opn. of Traynor, J.).) Justice Traynor could have addressed the same words to Mark's appeal here.

The latest word from our Supreme Court on the injustice exception is found in *Slater v. Blackwood* (1975) 15 Cal.3d 791. There the court cast serious doubt on the viability of the exception: "There is some authority for the proposition that, in particular circumstances, courts may refuse to apply res judicata when to do so would constitute a manifest injustice. [Citations.]. We consider the *Greenfield* doctrine of *doubtful validity*

---

[5]     And as noted in footnote 3 above, the absence of a reporter's transcript for the June 17, 2010 hearing did not prevent his perfecting his appeal.

[6]     Here's the key part of that passage: "But in rare cases a judgment may not be res judicata, when proper consideration is given to the policy underlying the doctrine, and there are rare instances in which it is not applied. In such cases it will not be applied so rigidly as to defeat the ends of justice or important considerations of policy." (*Greenfield, supra*, 32 Cal.2d at p. 35.)

7

and it has been severely criticized. (See 4 Witkin [Cal. Procedure 2nd ed. 1971)], Judgment, § 150, p. 3295, et seq.)" (*Slater, supra*, 15 Cal.3d at p. 796, italics added.)

Even if there is, under *Greenfield* and despite *Slater*, some still viable free-floating "injustice exception" to res judicata, we could not apply it in the appeal now before us. We really cannot say the June 17, 2010 order is "unjust." To do that, we would need a complete record of the two years covered by the discovery referee's report of March 4, 2010. *On its face* that report is a compendium of how, for almost two years, Mark virtually thumbed his nose at not only the discovery process, but the authority of the referee and essentially refused to take the referee's remonstrances seriously. Without a detailed play-by-play describing exactly how the referee came to make his recommendations – e.g., the nature of any warnings Mark may have had, and whether there was some progression of sanctions from small to great – we could not say the referee's recommendations, or their adoption by the court, were excessive or an abuse of discretion. (Cf. *Deyo v. Kilbourne* (1978) 84 Cal.App.3d 771, 793 ["The penalty should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery. Where a motion to compel has previously been granted, the sanction should not operate in such a fashion as to put the prevailing party in a better position than he would have had if he had obtained the discovery sought and it had been completely favorable to his cause."].) And that's quite apart from the overarching fact that Mark *had* his chance to demonstrate the June 17, 2010 order, was excessive, and chose not to pursue it.

There is also a "public policy exception" to res judicata, but that requires an issue of law, as distinct from an issue of fact. (See *People v. Barragan* (2004) 32 Cal.4th 236, 256 ["We have also recognized that public policy considerations may warrant an exception to the claim preclusion aspect of res judicata, at least where the issue is a question of law rather than of fact."].) Here, any injustice inherent in the June 17, 2010 order, is necessarily a question of fact, as the question would turn on factual minutiae that

could have been litigated in the now-abandoned appeal. Such factual minutiae would include the exact nature of the warnings Mark had from the discovery referee, the exact nature of his compliance or noncompliance with any direct orders by the discovery referee, and the true nature of his income *if* he – as the discovery referee pointedly noted he didn't do – had supplied the original source material (the contracts) which would allow a forensic accountant to come up with some idea of his true income. There is some indication in this record his income and assets have been understated.[7]

That leaves only the idea the June 17, 2010 order, is somehow void, hence liable to attack at any time. But to be so void, the court in making the order necessarily had to lack jurisdiction "in a fundamental sense" – meaning an absence of legal authority over the subject matter or the parties. (See *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 660 ["Essentially, jurisdictional errors are of two types. 'Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties.' . . . When a court lacks jurisdiction in a fundamental sense, an ensuing judgment is void, and 'thus vulnerable to direct or collateral attack at any time.'"].) And here there is no hint the family law court that made the order of June 17, 2010, didn't have jurisdiction over Mark to make him pay increased child support. Likewise there is no possibility the proceeding lacked due process. Mark had plenty of notice and opportunity to be heard.

B. *The Order of July 17, 2012*

The Family Code provides what might be called some limited statutory exceptions to res judicata by explicitly providing for set aside orders under certain prescribed conditions. (See § 2120, subd. (c) ["The public policy of assuring finality of

---

[7]     There is the matter of Mark's interest in some Alaskan property (or a combination of two properties) which purportedly might be worth $400,000 or more, though he may have taken some measures to put them under the control of other family members.

judgments must be balanced against the public interest in ensuring proper division of marital property, in ensuring sufficient support awards, and in deterring misconduct."].) Section 2122 sets out grounds *and time limits* for certain categories of set aside motions: Actual fraud and perjury provide one year, from date of discovery or time the aggrieved party should have discovered, to set aside a judgment, while the period is two years for duress or mental incapacity. (§ 2120, subds. (a), (b), (c) and (d).) So Mark's set aside motion was not necessarily dead on arrival as a matter of the issues having already been a "thing judicially decided."

That said, we can find no fault in the trial court's denial of the set aside motion qua set aside motion. As to the Corona Del Mar condo, Mark's brief does not present a single argument that would justify a conclusion Tania had lied about her assets given the uncontroverted evidence that any interest in the condo is entirely her husband's separate property.

As to the time share, on the merits the evidence is mixed.[8] It is true that Dorian – having turned 18 – supplied his father with a declaration that the time share in his last two years of his minority was 50-50, not 75-25 in favor of Tania. But we have examined Dorian's declaration and it is extremely general. As between it and Tania's declaration of July 20, 2010, a trial court could readily conclude Tania's characterization of time spent was the more accurate. Tania's declaration specifically itemized the actual days of custody each parent had custody of their son in the period August 2009 to July 2010. (E.g., "May 2010: 1st, 2nd, 5th-16th; 20th-30th (23 days out of 31) 74%.") The months ranged from a low of 58 percent in March 2010 to a high of 78 percent in July 2010. If our math is correct, the average was 71.16 percent as a monthly average. That is all of 3.84 percent below 75 percent. A trial judge would hardly be required to find, as a

---

[8] While the trial court was certainly correct that the time share issue *is* res judicata because it was litigated in the challenges to the June 17, 2010 order, that determination does not end the inquiry. Under the Family Code set aside statutes, the question is not whether a point has been previously litigated, but whether that point was supported by, among other things, perjury in the previous litigation.

matter of law, that Tania had perjured herself in coming up with the 75 percent figure. The approximation is simply too close. We further note that Tania's declaration was available to Mark when Dorian prepared his, so if there were specific inaccuracies in Tania's declaration, Dorian could have identified them.

C. *The Sanctions in the July 17, 2012 Order*

Mark's best argument goes to the problem of sanctions, though the argument is not wholly developed. The trial court sanctioned Mark an additional $15,103.50 in sanctions, basically for having brought a total loser of a motion and putting Tania to the unnecessary expense of defending against it. Mark points to the fact that Dorian did not testify in regard to the original June 17, 2010 order, so it seems unfair that Mark should pay sanctions when Dorian provided at least some evidence that Tania may have been lying back in 2010 to claim a 75-25 timeshare. Moreover, Mark notes, the trial court determined the set aside motion was entirely barred by res judicata, but Dorian's declaration came after the 2010 order was final, so how could the court penalize Mark for invoking the opportunity the statute gives him, i.e., to set aside prior orders if based on perjury.

But the trial court was correct in determining the entire set aside motion was barred by res judicata. The doctrine of res judicata not only includes issues that *were* litigated in a prior order or judgment, but issues that *could have been* litigated as well. (See *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 557 [res judicata, if applicable, "not only precludes the relitigation of issues that were actually litigated, but also precludes the litigation of issues that could have been litigated in the prior proceeding."].) In this respect we note that Dorian was almost 18 years old during the summer of 2010 when Mark was offering varying declarations in an attempt to challenge the June 17, 2010 order. Mark has offered no excuse why Dorian's declaration could not

11

have been offered then, particularly if Tania had so overstated the timeshare as to commit perjury.  Whether he litigated the issue or not, he clearly *could* have.[9]

The order of July 17, 2012, is affirmed.  Appellate costs must go to Tania.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


ARONSON, J.

---

[9]     Mark says he didn't call Dorian because he feared his 17-year-old son would be emotionally devastated by testifying he stayed with his father 50 percent of the time.  Even if that were his reasoning, the law does not allow a party to choose what witnesses to call and then ask for a do-over if things don't go well.