Filed 2/27/24  Jones v. Costco Wholesale Corp. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| TERRY JONES, | |
| Plaintiff and Appellant, | G061563 |
| v. | (Super. Ct. No. 30-2019-01066989) |
| COSTCO WHOLESALE CORPORATION, et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment and postjudgment order of the Superior Court of Orange County, David A. Hoffer, Judge.  Affirmed.

Employee Justice Legal Group, Kaveh S. Elihu and Samuel J. Moorhead for Plaintiff and Appellant.

Satia Austin, in pro. per., as Amicus Curiae on behalf of Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Todd E. Lundell, Matthew S. McConnell, Tara Wilcox, Sieun J. Lee and Tracey A. Kennedy for Defendants and Respondents.

Terry Jones unsuccessfully sued his former employer, Costco Wholesale Corporation (Costco), and his former supervisor, Kun Tang, for racial harassment and related claims. Although a jury found Jones had been subjected to harassing conduct because of his race, it found the harassment was not severe or pervasive and Jones hadn't suffered harm from it. On appeal, Jones complains of evidentiary error and insufficient evidence to support the judgment. We affirm.

## FACTS

In November 2015, Costco hired Jones as a meat cutter. At the meat department where Jones worked, all the employees were men. One employee described it as a "relaxed environment" with people "'joking around'" and talking about current news, sports, and movies. Another employee said the department had "a fraternity kind of vibe, locker room kind of vibe, [where] lots of jokes were made at the expense of everybody who worked there." Jones, the only black person in the department, was subjected to jokes about his race. Jones was employed there until June 2018, when he was fired for eating rotisserie chicken headed for the "bone barrel," a violation of Costco's policy prohibiting employees from eating Costco food they didn't buy, including product destined for the trash (the no-grazing policy).

The next year, Jones filed a complaint against Costco and Tang, asserting 12 causes of action: (1) discrimination; (2) harassment; (3) retaliation; (4) failure to prevent discrimination, harassment, and retaliation; (5) failure to provide reasonable accommodations; (6) failure to engage in a good faith interactive process; (7) violation of the California Family Rights Act; (8) negligent supervision and retention; (9) intentional infliction of emotional distress; (10) declaratory judgment; (11) denial of and discrimination based upon the use of sick leave; and (12) wrongful termination in violation of public policy. The first six claims were brought under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940 et seq.).

2

Defendants moved for summary judgment, or in the alternative, summary adjudication of all claims. The trial court granted summary adjudication of the ninth, tenth, and eleventh claims. The court denied summary adjudication of all other claims and found a triable issue of material fact on whether the claimed harassment was severe or pervasive.

By the first day of trial, Jones had voluntarily dismissed all but three claims: racial harassment, failure to prevent racial harassment, and negligent supervision and retention. He also waived economic damages.

At trial, Jones testified that within his first few months on the job, Tang began harassing him by making race-based comments and the harassment "just progressively got worse" over time. Jones presented evidence of eight categories of comments comprising his harassment claim.

1.    *Black Panther and Gato Negro*

Tang and others called Jones "Black Panther," in reference to the Marvel movie of the same name. According to some Costco employees, Jones would often call himself Black Panther or Gato Negro (Spanish for Black Panther), he would ask others to call him Black Panther, he did so "in a jokeful [*sic*] manner, happy manner," and it "didn't seem[] like it bothered him." Jones denied calling himself Black Panther at work but acknowledged calling himself Gato Negro once or twice.

2.    *Wakanda References*

Jones testified Tang told him to "'[g]o back to Wakanda,'" the fictional African home country of Black Panther. At trial, Jones testified Tang began saying this to him in February 2018 and continued to do so until Jones left Costco. The jury, however, heard deposition testimony in which Jones stated it was only three or four times, in February 2018.

3

One employee testified to having heard someone say, "'Go back to Wakanda,'" although he did not identify who. Other coworkers testified Jones said he was from Wakanda and wanted to go back.

There was also evidence Jones would smile and give the Black Panther greeting, "'Wakanda Forever,'" and do the gesture–crossing of the arms–"many times" to people in the department. Both Tang and Jones were observed saying, "'Wakanda Forever,'" and "kind of joking around." One employee remarked that Jones "was laughing and joking" and that "[i]t didn't seem like it bothered him."

### 3. *Wayans Brothers Television Show Song*

Jones testified Tang would go around work singing a song from the Wayans Brothers television show, which included the lyrics: "'We're brothers. We're happy, and we're singing, and we're colored.'" Tang denied doing this.

### 4. *Underground Railroad*

Jones testified when he came to work late, Tang said something to the effect of, "'Hey, you should have taken the underground railroad to get to work on time.'" Another coworker testified that Jones "would be late for work, and [Tang] would make" the comment, and that Jones responded by chuckling and laughing. When asked if Tang made the comment once or twice, Jones said it happened "often," but he could not "put a number on it." When asked if it was more than a hundred times, Jones again responded, "I cannot put a number on it."

### 5. *Lincoln and Slavery References*

According to Jones, Tang would say, "'I'm Abe Lincoln, and I freed you. Go Home.'" Tang denied ever saying this. One employee heard Tang tell Jones, "Go home early . . . 'You're free. You can go,'" without any specific reference to Lincoln or slavery. Another employee testified Jones said to Tang, "'I'm free to go boss man,'"

4

while laughing and joking.

6. *"Black People Lie"*

According to Jones, Tang once asked him to come to work early, and when Jones did not, Tang stated in front of the meat department manager, Michael Farrier, that "'[b]lack people lie.'" Farrier denied hearing Tang make that comment.

7. *"Bat Mang" Photo*

Jones testified Tang showed him a picture on his phone of black rapper Gucci Mane dressed as Batman and said, "'Hey, look. Look at Terry. Look at Terry. Ha ha ha.'" According to Jones, "everyone in the department saw the picture." Only one employee, however, testified to the "'Bat Mang'" meme going around, but he "d[idn't] believe Kun [Tang] even really used that meme."

8. *"Terr-mometer" Nickname*

Once Jones came to work with a thermometer in his mouth to prove he was sick. Jones testified Tang made fun of him by calling him Terr-mometer for an entire year. Tang admitted to using that nickname, but for "[j]ust that one joke and that was it." Another employee testified multiple people called him Terr-mometer and did it more and more frequently "especially because Terry would call out more frequently."

Based on these events, Jones sought emotional distress damages. He described the harassment as "kind of like somebody jiggling a knife in you ever[y] so often." He testified Tang's racial comments hurt and left an emotional scar, he had difficulty trusting people, and it was hard for him to sleep. His fiancée testified that during this time "he became very distant, stressed out, always worrying." In August 2017, Jones took a leave of absence due to job-related harassment and depression. He told his healthcare provider he was seeking help for issues with his fiancée, being given too much work at Costco, and being overwhelmed with his management position; he did not mention he had been subjected to racial harassment. In early 2018, Jones started

5

getting written up for more work absences and tardiness. At trial, the parties offered competing expert testimony on the nature and extent of Jones's emotional distress.

At trial, Jones testified he had complained of Tang's harassment twice in 2017 — once in front of Farrier and employee Julio Ramirez, and another time to Farrier in a performance review. However, at his deposition, Jones testified he had complained of discrimination, harassment, or retaliation only to assistant general manager Eddie Robles. Ramirez, Farrier, and Robles all denied Jones had ever complained. As for Jones's performance review, Farrier had noted Jones "'frequently complains about his coworkers in his department in a negative way.'" Farrier testified his notation meant Jones "had an attitude that he was much better than his coworkers at doing his job" and sought more favorable shifts.

To rebut Jones's claims the harassing conduct was unwelcome, Costco introduced evidence of Jones's conduct at work. According to some employees, when an attractive woman passed by, Jones would comment she "'needs the BBC,'" meaning "'big black cock.'" Another employee recalled a time when Jones called himself a slave and smiled while asking why he had "'to do all this work.'" When Jones was seen violating the no-grazing policy, he told a coworker he couldn't get in trouble because he could "use the race card." According to other employees, Jones called Asians "'chinks'" and Mexicans "'wetbacks.'" He made other Asian-based remarks, including asking why "'Asians eat cats and rats,'" asking why they are very short, and calling Tang "'Mr. Chow,'" an Asian character from the movie *The Hangover*.

Defendants also presented evidence of a friendly relationship between Jones and Tang. At Tang's invitation, Jones attended two parties hosted by Tang's family. Tang occasionally drove Jones to work, and Jones would lend his car to Tang. And Jones sometimes borrowed money from Tang.

The jury rendered a defense verdict. On the racial harassment claim against defendants, the jury found Jones was subjected to harassing conduct because he was

African American, but the harassment was neither severe nor pervasive. On the claim against Costco for failure to prevent racial harassment, the jury found Costco failed to take all reasonable steps to prevent the harassment, but its failure was not a substantial factor in causing harm to Jones. And on the claim against Costco for negligent supervision and retention, the jury found Tang was unfit or incompetent to perform the work for which he was hired, Costco knew or should have known Tang's unfitness or incompetence created a particular risk to others, but Jones wasn't harmed.

After judgment was entered, Jones moved for new trial and judgment notwithstanding the verdict (JNOV). While the motions were pending, Jones appealed the judgment. Weeks later, the trial court denied both motions.

## DISCUSSION

I. *Evidence Code Section 352*

Jones contends the trial court prejudicially erred by admitting irrelevant, unduly prejudicial, confusing, and misleading evidence. The challenged evidence concerned his employment (or lack thereof) before and after Costco, his attendance and tardiness at work, statements about his "BBC," his borrowing money from Tang, and his termination for violating the no-grazing policy. He argues this evidence was unduly prejudicial for five reasons: (1) It tended to evoke an emotional/racial bias against him as a black man; (2) the meanings of some of the words elicited through witness testimony were "'wholly speculative'"; (3) it was not relevant to his credibility; (4) admission of the evidence made the trial fundamentally unfair; and (5) the trial court failed to weigh the combined, or cumulative, effect of the errors. Jones also contends "[t]he trial court's distorted and biased reasoning in support of its evidentiary rulings also shows that the [challenged evidence] may have unconsciously confused and misled the trial court itself." We address, and reject, each contention.

A. *Forfeiture*

Before addressing the merits of Jones's claims, we first determine the scope

7

of issues preserved for appeal.  As we shall explain, we conclude three claims have been forfeited.

We begin with Jones's insinuation the trial judge exhibited bias against him.  "Bias and prejudice are grounds for disqualification of trial judges.  ([Code Civ. Proc.,] § 170.1, subd. (a)(6).)  And if judges fail to recuse themselves, there is a statutory procedure to litigate the issue.  ([*Id.*,] § 170.3.)"  (*Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1218.)  A party forfeits this issue, however, when he "[does] not object to the alleged improprieties and [does not ask] the judge to correct remarks made or recuse himself."  (*Ibid.*; see also *People v. Pearson* (2013) 56 Cal.4th 393, 424 ["to the extent defendant frames his claim as one of judicial bias or racial discrimination by the trial court in deciding his challenge for cause, it is forfeited on appeal because he failed to alert the court to the perceived bias"].)  Here, Jones does not contend he objected below or moved to disqualify the trial judge.  Nor did our review of the record uncover any such efforts.  We thus deem the issue forfeited.  In any event, we note that generally "'a trial court's numerous rulings against a party—even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review.'"  (*People v. Fuiava* (2012) 53 Cal.4th 622, 732.)

Next, we consider the claim the trial court abused its discretion in not excluding evidence under Evidence Code section 352 (section 352).  To preserve this claim, "'a party must make a timely and *specific* objection when the evidence is offered.'"  (*People v. Harrison* (2005) 35 Cal.4th 208, 230, italics added.)  The objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling.  If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason

8

different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*); Evid. Code, § 353, subd. (a) [judgment cannot be reversed for erroneously admitted evidence unless appellant made timely objection that "make[s] clear the specific ground of the objection or motion"].)

After a careful review of the record, we conclude Jones's section 352 objection below raised concerns of relevance, confusion of the issues, and undue consumption of time. But the objection did not fairly inform the trial court Jones was objecting to the challenged evidence because (1) it tended to evoke an emotional/racial bias against him as a black man; or (2) the meanings of some of the terms — "BBC," "grazing," and "playing the race card" — were "wholly speculative."

At the outset of trial, Jones raised concerns about admission of the challenged evidence. This occurred after he had dismissed his disability discrimination and wrongful termination claims, but before opening statements were given. Jones's counsel objected to slides in the defense's PowerPoint presentation for opening statement. According to Jones's counsel, certain slides "appear[ ] to be an opening designed for a disability discrimination and wrongful termination case that addresses [section] 352 issues such as discipline, which is irrelevant in this case, reasons for termination; there's no wrongful termination issue, and other things that we've addressed to some degree so far with the court and then I think were whittled out of this case."

In overruling the objection, the court stated the defense would be allowed to tell "the whole story." The court noted some slides "certainly have to do with suspensions and termination, which are not a basis for a request for damages," but determined "the incidents of harassment exist in a context of a relationship that can be told." The court surmised the opening statement would be "fairly short" and cautioned against spending excessive time on the issues, which might allow the section 352 concerns to "rise to the surface again."

9

In response, Jones's counsel restated his objection for the record: "[T]he concern here, from our perspective, is that this is going to evolve into a smear campaign against Mr. Jones. This is going to be — they're going [to] try the wrongful termination case here. They're going to try the disability discrimination case, which is irrelevant in this case. They're going to make this case about something it is no longer about. They're going to confuse the jury. They're going to create confusion complexity and ambiguity. And that's how they plan to win. They do not plan to win on the merits based on this opening statement and what appears in this opening statement. [¶ . . . ¶] Nothing related to Mr. Jones' employment before or after Costco has anything to do with anything in this case. They're going to attack Mr. Jones, very clearly, based on issues supposedly in his resume that deal with supposed after-acquired evidence, which has nothing to do with the harassment case, because this isn't a wrongful termination case. They're going to smear Mr. Jones and make this case fundamentally and substantially about something it is just not." In response, the court noted it was "making its ruling without prejudice to a future [section] 352 motion should the defense be engaging in substantial evidence that has nothing to do with the basis for damages." Later, counsel added: "Your Honor, I want to make sure my objections are noted for the record, so I don't have to repeat them as we keep going." And the court confirmed: "All right. Those are noted for the record."

This colloquy was sufficient to preserve Jones's objection on grounds of relevance, confusion of the issues, and undue consumption of time, but not on grounds of undue prejudice from racial bias or speculation. Nearly every time thereafter, when Jones's counsel made a section 352 objection to testimony or evidence, he simply stated "352" or "Evidence Code section 352." Because the section 352 objection made no mention of undue prejudice from racial bias or speculation, it did not "fairly inform" (*Partida*, *supra*, 37 Cal.4th at p. 435) the court or defense counsel of this evidentiary dispute.

10

Had Jones alerted the trial court, the court would have had the opportunity to consider whether the evidence tended to evoke a racial bias against him or lead the jury to speculate on the meaning of certain terms. For example, in a motion in limine, Jones sought to exclude reference to his drug use, arguing it was subject to exclusion under section 352 as "very prejudicial." His counsel argued it was "improper character evidence," "substantially more prejudicial than probative," and "an attempt to smear and malign" Jones. The court agreed and excluded the evidence. Because Jones deprived the trial court of this opportunity with respect to the challenged evidence, he has forfeited this challenge on appeal.

Finally, defense counsel cross-examined Jones about his employment after Costco. Without objection, Jones testified he got a job at Sam's Club a few weeks after leaving Costco, worked at Sam's Club for about nine months, and since then has been unemployed. By failing to object, Jones has forfeited this issue on appeal. (*People v. Dykes* (2009) 46 Cal.4th 731, 756.)

B.      *The Remaining Objections*

We turn now to Jones's remaining objections of relevance, confusion of the issues, and undue consumption of time. Section 352 permits a trial court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review a trial court's section 352 ruling for abuse of discretion. (*People v. Lindberg* (2008) 45 Cal.4th 1, 49.) Of the five categories of evidence Jones contends should have been excluded, we conclude the trial court acted within its discretion in admitting four categories. As to the fifth category, we determine any error in its admission was harmless.

First, although Jones argues the court should have excluded evidence of his work absences, tardiness, and resulting writeups, he acknowledges the evidence was

11

relevant, and indeed helpful, to "prove[] the frequency or pervasiveness of Tang's harassment."

Second, the trial court allowed evidence of Jones commenting at work that attractive women "'need[] the BBC.'" This evidence, along with comments Jones made about other races, was relevant to refute Jones's claim he never participated in "a frat house mentality."

According to Jones, however, the trial court "assume[d] an improper false equivalency" between Jones's alleged remarks and Tang's race-based comments. Jones argues the two are not comparable because no one complained about Jones's conduct, while Jones complained of Tang's. To support this argument, Jones relies on three Ninth Circuit opinions: *Hawn v. Executive Jet Management, Inc.* (9th Cir. 2010) 615 F.3d 1151 (*Hawn*); *Vasquez v. County of Los Angeles* (9th Cir. 2003) 349 F.3d 634 (*Vasquez*); and *Meyer v. California and Hawaiian Sugar Co.* (9th Cir. 1981) 662 F.2d 637 (*Meyer*). These opinions, however, do not help Jones.

In all three cases, the plaintiffs were suing for discrimination, in part, on the grounds they had suffered an adverse employment action and their employer's proffered reasons were pretext for discrimination, as evidenced by the fact other similarly situated employees did not suffer the same adverse employment action. (See *Hawn*, *supra*, 615 F.3d at p. 1153 [male pilots terminated for sexual harassment claimed similarly situated female flight attendants not fired for similar conduct], *Vasquez*, *supra*, 349 F.3d at p. 641 [probation officer transferred to field position and issued a warning letter claimed similarly situated employees were treated better], and *Meyer*, *supra*, 662 F.2d at p. 640 [employee fired for racial remarks claimed other employees made similar remarks but were not fired].) At issue in all cases was whether evidence of the treatment of allegedly "similarly situated" (*ibid*.) employees was relevant to prove the plaintiffs' discrimination claims. But in this case, there is no discrimination claim based on an adverse employment action, and evidence of Jones's workplace conduct was not offered to show

12

similarly situated Costco employees were treated differently from Jones. Rather, defendants offered the evidence to show Jones was not harmed by Tang's remarks, since he freely participated in the "locker room" or "frat house" environment by making sexual and racial comments.

Third, evidence of Jones borrowing money from Tang tended to support the defense claim that the two were on friendly terms. The jury could reasonably infer people would not ask to borrow money from someone they felt was harassing or bullying them.

Fourth, evidence of Jones's performance reviews and the reason for his termination were relevant to the issue of whether Jones complained of harassment. As an affirmative defense, defendants invoked the doctrine of avoidable consequences, arguing Jones "could have avoided some or all of the harm with reasonable effort." (CACI No. 2526.) This defense required defendants to prove Jones "unreasonably failed to use the preventive and corrective measures for harassment" provided by Costco. The reviews were opportunities for Jones to report harassment, and defendants relied on them to show no harassment had been reported. As for evidence concerning Jones's termination, Jones claims he reported harassment at the meeting where he was suspended for grazing. But according to defendants, Jones did not complain of harassment until after he was suspended. Jones testified he knew grazing was a "fireable offense," and a coworker testified Jones said he could "use the race card" to avoid the consequences of his action. Evidence concerning his termination was thus relevant to show Jones's motive to lie to deflect the grazing charge. (Evid. Code, § 780, subd. (f).)

Fifth, the defense introduced deposition testimony from a worker's compensation matter in which Jones stated that in 2014 he took a year off work and was supported by his fiancée. Counsel for Jones objected on section 352 grounds and noted the worker's compensation matter "has nothing to do with this case." In his opening brief, Jones claims this evidence was unduly prejudicial because it characterized him "as

13

freeloading off his fiancée" in 2014. At oral argument, however, Jones's counsel acknowledged "that particular piece of evidence may go to veracity." As argued by defendants, Jones's worker's compensation testimony contradicted a statement in his Costco application indicating he had worked in 2014 as a Vons manager.

Even assuming the trial court erred in admitting worker's compensation evidence, we conclude the error was harmless. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227 [§ 352 error evaluated under harmless error standard in *People v. Watson* (1956) 46 Cal.2d 818, 836].) Under the *Watson* standard, reversal is required only if "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Id.* at p. 836.) When asked how he supported himself, Jones replied, "Savings and a good fiancée." His response suggests he had saved up money to take part of the time off, a reasonable interpretation favorable to Jones. He does not identify, nor could we find, in the record where defense counsel suggested Jones was "freeloading." We thus are not persuaded Jones would have obtained a more favorable result if this testimony had been excluded.

Given our conclusion, we reject Jones's cumulative error argument.

II.     *Evidence of Severe or Pervasive Harassment and Resulting Harm*

A plaintiff who loses a jury trial and appeals the judgment due to insufficient evidence "faces an extremely high burden on appeal." (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651 (*Estes*).) Because the plaintiff bears the burden of proof at trial, the issue on appeal is not "'"whether substantial evidence supports the judgment,"'" but "'"whether the evidence *compels a finding in favor of the [plaintiff] as a matter of law*."'" (*Ibid.*) For the plaintiff to prevail on appeal, we must conclude the plaintiff's "'"evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.'"'" (*Ibid.*) This "'onerous standard' . . . is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific

14

factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that 'plaintiff's evidence lacks sufficient weight and credibility to carry the burden of proof.'" (*Ibid.*)

"Furthermore, we 'must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment.' [Citation.] """"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.""""" [Citation.] Indeed, 'the jury is not required to believe the testimony of any witness, even if uncontradicted.'" (*Estes*, *supra*, 51 Cal.App.5th at p. 651.)

A.      *No Severe or Pervasive Harassment*

The uncontradicted and unimpeached evidence (*Estes*, *supra*, 51 Cal.App.5th at p. 651) of Tang's potentially harassing conduct was comprised of: (1) his references to Jones as Black Panther; (2) his Wakanda references; (3) his comment Jones should have taken the underground railroad; and (4) his calling Jones Terr-mometer.[1]

---

[1]      Jones contends several testifying Costco employees who contradicted his testimony were "coached." To the extent Jones is arguing the jury was required to disregard their testimonies entirely, we are unpersuaded. Although certain employees confirmed they had discussed the case with Costco's counsel before trial, none of them unequivocally stated they were told to testify falsely. Ramirez acknowledged talking to Costco's counsel about his testimony before trial. Martin Quintana, who testified through a Spanish interpreter, denied counsel offered suggestions about what to say, but he responded "yes" when asked if "they actually fed you information such as you don't remember or you didn't hear Kun Tang saying certain things?" Herson Tejeda stated counsel asked him questions and "guided" him to certain topics. And Stephen Avila stated counsel "asked [him] some questions and gave [him] some topics on things that are going to come up" and what "she was going ask [him] about." Ultimately, the substance of these conversations with counsel were admitted into evidence for the jurors to consider in assessing witness credibility. (See *Estes*, *supra*, 51 Cal.App.5th at p. 651.)

15

Actionable harassment occurs "'"[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is '"sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'"'" (*Caldera v. Department of Corrections & Rehabilitation* (2018) 25 Cal.App.5th 31, 38.) "The determination 'is ordinarily one of fact.' [Citation.] All harassment claims require severe *or* pervasive conduct. [Citation.] The words 'severe' and 'pervasive' have no peculiar meanings under the law. The adjective 'severe' is defined as 'strongly critical and condemnatory' or 'inflicting pain or distress.' [Citation.] The verb 'pervade' is defined as 'to become diffused throughout every part of.'" (*Ibid.*)

The working environment must be both objectively and subjectively hostile, "'"one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 284.) The objective component "prevents . . . harassment law from being expanded into a 'general civility code.'" (*Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1377; *Lyle*, at p. 295 ["FEHA is 'not a "civility code"'"].) The severe or pervasive question "must be assessed from the 'perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff.'" (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 264.)

To decide whether conduct was severe or pervasive, the jury was instructed to "consider all the circumstances, including *any or all* of the following: [¶] (a) The nature of the conduct; [¶] (b) How often, and over what period of time, the conduct occurred; [¶] (c) The circumstances under which the conduct occurred; [¶] (d) Whether the conduct was physically threatening or humiliating." (CACI No. 2524, italics added.)

Considering the totality of circumstances and resolving all conflicts in the light most favorable to the judgment, we cannot conclude the evidence was of such a character and weight as to compel a finding Jones was subjected to severe or pervasive harassment. Although Tang called Jones Black Panther and greeted him by saying,

16

"'Wakanda forever,'" there was ample evidence Jones acted similarly and in jest. The same could be said of Tang calling Jones Terr-mometer, that is, Tang was poking fun at Jones for coming to work with a thermometer in his mouth. Tang also testified he made this joke once, not for an entire year. As for the underground railroad comment, we agree with Jones the remark was entirely inappropriate. However, it is unclear from the record how often the remark was made. Based on this evidence, we cannot say as a matter of law the jury was required to find the harassing conduct severe or pervasive.

B.    *No Harm to Jones*

On the negligent supervision claim, the jury was instructed Jones had to prove Tang's unfitness or incompetence harmed Jones. (CACI No. 426.) And on the failure to prevent harassment claim, the jury was instructed Jones had to prove he was harmed. (CACI No. 2527.) The jury, however, found Jones had not been harmed by Costco or Tang. Jones contends substantial evidence does not support these findings. He argues that "based on the testimony of expert witnesses," the jury was compelled to find he had been harmed by defendants' harassing conduct. We disagree. The jury could have reasonably rejected the expert testimony and found Jones hadn't suffered actionable harm.

The "credibility of expert witnesses is a matter for the jury after proper instructions from the court." (*Williams v. Volkswagenwerk Aktiengesellschaft* (1986) 180 Cal.App.3d 1244, 1265.) The jury "'may reject *in toto*'" uncontradicted expert testimony, so long as the jury "'does not act arbitrarily.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.) Here, the jury was instructed: "You do not have to accept an expert's opinion. As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision. You may believe all, part, or none of an expert's testimony." (CACI No. 219.) The jury was further instructed it should consider "[t]he facts the expert relied on" and "reasons for the expert's opinion" in deciding whether to believe an expert's testimony. (*Ibid.*)

17

Jones's expert, psychologist Anthony Reading, reviewed Jones's family, social, educational, occupational, and medical histories, and the deposition transcripts of Jones and the coworker who reported him for grazing. Dr. Reading also met with Jones for three to four hours to administer three tests. Two of those tests "were invalid" due to Jones "endors[ing] a very high number of atypical or low frequency items, which raises concerns about over-reporting of symptoms." A possible explanation for the high number is the test-taker is "largely fabricating." If a test is invalid, no further interpretation can be made. The third test, although "interpretable, . . . suggested an over-reporting or exaggeration."

Dr. Reading nonetheless opined the data supported two diagnoses for Jones: "an adjustment disorder with anxiety, which is a diagnosis that's provided where there is indication of threat," and "a depressive disorder, adjustment disorder with depressed mood to capture [Jones's] feelings of depression," which "led to low self-worth, loss of motivation, emotional liability, depression." In short, the expert testified Jones "developed psychiatric illnesses arising from his experience at Costco. . . . [¶] So he had the experience at work culminating in what he felt was an unfair loss of his job. And so he developed two illnesses."

Dr. Reading explained, "To the extent [Jones's] report comports with what happened, if those events occurred, then they would have the potential to derail him and cause the onset of psychiatric illness." The expert further added, "I'm not here to establish truth. And as I say, I'm providing opinions with the caveat, 'to the extent these events occurred as claimed.' I can't establish -- it's not for me to establish what occurred." When asked if his opinion "would be reevaluated" if the events described by Jones were not accurate, Dr. Reading acknowledged "some of it would change . . . . The degree to which it would change I can't tell you."

We cannot say the jury was unreasonable in rejecting Dr. Reading's testimony regarding harm to Jones. Although Dr. Reading opined Jones suffered from

18

two disorders due to the harassment he faced at Costco, his opinion was based in part on the assumption Jones accurately described the harassment. Dr. Reading also testified all tests administered to Jones suggested he was "over-reporting" and two tests were deemed invalid as a result. Had the jury believed some harassment had not occurred or the tests were unreliable, it could have disregarded Dr. Reading's opinions altogether. (See *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 ["expert opinion may not be based on assumptions of fact that are without evidentiary support or based on factors that are speculative or conjectural, for then the opinion has no evidentiary value"].) In short, the jury could have found Dr. Reading's opinions were based on flawed facts and thus properly rejected his opinions.

A similar conclusion applies to defense expert Francine Kulick, who also reviewed similar documents and met with Jones for a few hours. Dr. Kulick could not score Jones's psychological test "because of an exaggerated description of symptoms," which she believed "was an expression of his chronic psychological problems which predate his work" at Costco. She testified Jones suffered from bipolar disorder and residuals of posttraumatic stress disorder, which began in 2005 when Jones lived in New Orleans through Hurricane Katrina and continued after he left Costco.

According to Dr. Kulick, Jones "had an adjustment disorder with features of anxiety and depression in relation to his stressful work environment" at Costco, experienced some anxiety and depression, felt as though he had been mistreated, and described experiencing some financial problems. But Dr. Kulick did not opine that Jones suffered harm from racial harassment. Instead, when asked if "the racial comments" caused him emotional distress, Dr. Kulick replied, "I think something -- work was stressful for him, and he -- I thought he had an adjustment disorder related to that stress at work. *And I defer to the trier of facts as to what specifically about work was stressful to him.*" (Italics added.)

In addition to "the racial comments," the jury heard testimony of other

19

potential causes of the work-related stress claimed by Jones. In 2017, Jones had taken a leave of absence from Costco. During this leave, Jones reported to his healthcare provider he had been given too much work and was overwhelmed with his management position. On this record, we cannot say the jury was unreasonable in rejecting Jones's claim of harm resulting from racial harassment. Nor are we compelled to find Jones was harmed by Tang or Costco as a matter of law. (*Estes*, *supra*, 51 Cal.App.5th at p. 651.)

III.     *The Motions for New Trial and JNOV*

Jones contends the trial court erred in denying his motions for new trial and JNOV. We disagree.

The new trial motion was based on the same grounds Jones raised on appeal from the judgment: the jury's finding the harassing conduct was not severe or pervasive was erroneous as a matter of law (Code Civ. Proc., § 657(2)); the evidence was insufficient to support the jury's finding of no harm to Jones (*id.*, § 657(6)); and Jones was unfairly prejudiced by the admission of evidence of his attendance record, termination, and comments about his genitalia (*id.*, § 657(1)). Having considered — and rejected — those arguments and having reviewed the entire record on appeal, we conclude the court did not err in denying the new trial motion. (See *Minnegren v. Nozar* (2016) 4 Cal.App.5th 500, 514, fn. 7 [denial of new trial motion reviewed for abuse of discretion, but factual determinations reviewed for substantial evidence]; *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 872 [appellate court reviews "entire record, including the evidence, so as to make an independent determination as to whether the error was prejudicial"].)

As for the JNOV motion, we lack jurisdiction to consider a challenge to its denial. Because an order denying a JNOV motion is separately appealable (Code Civ. Proc., § 904.1, subd. (a)(4)), Jones had to "file a timely notice of appeal from the order to obtain appellate review. [Citation.] A notice of appeal from a judgment alone does not encompass other judgments and separately appealable orders." (*Sole Energy Co. v.*

20

*Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 239.) Here, Jones's notice of appeal identified only the judgment, and not the later order denying the JNOV motion. Although a "notice of appeal must be liberally construed" (Cal. Rules of Court, rule 8.100(a)(2)), even a liberal construction of the notice would not encompass the denial of the JNOV motion. This is because the notice of appeal was filed *before* the JNOV motion was denied. Simply put, the notice of appeal cannot be read to encompass a ruling that had not yet occurred.[2]

IV.    *Allegations of Jury Bias and Jury Nullification*

Having evaluated Jones's claims of evidentiary error and sufficiency of the evidence, we come now to his overarching contention: "[T]he jury engaged in civil jury nullification, ignoring the law and the facts to impose its own judgment based on conscious or unconscious extralegal racial, bigoted, or irrational considerations (i.e., implicit bias) in light of [defendants'] presentation of evidence that was unduly prejudicial to [him] and was of little or no probative value."[3] In other words, Jones argues no reasonable, unbiased jury could have believed defendants over him. After combing through the appellate record, we cannot agree.

"Actions for unlawful discrimination . . . are inherently fact-driven, and we recognize that it is the jury, and not the appellate court, that is charged with the obligation of determining the facts." (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 389.) Counsel for Jones recognized as much in his closing argument to the jury: "So jury instruction number nine, which is CACI 107 -- That's why

---

2        Even if we had jurisdiction to consider this issue, Jones would fare no better. The JNOV motion was based on insufficient evidence to support the jury's finding Jones was not harmed, a contention we have already rejected.

3        Jury nullification refers to the ability of a jury in a criminal case "to disregard, or nullify, the law." (*People v. Williams* (2001) 25 Cal.4th 441, 449.) It is "'"a power which they ha[ve] no right to exercise."'" (*Id.* at p. 450.)

21

it's worded that way -- talks about witnesses. And I have bolded it, C and D, because that's what I think is particularly important. You get to determine truthfulness and credibility and whether somebody is being honest by looking at how they look, act, and speak while testifying. And then you get to see, did the witness have any reason to say something that was not true? Those are two significant factors, I think, that I'm hoping you'll pay attention to and consider significantly with regard to the witnesses here."

Our review of the record reveals Jones received a fair trial. (See *Kelly v. Trans Globe Travel Bureau, Inc.* (1976) 60 Cal.App.3d 195, 214 (conc. opn. of Hanson, J.) [plaintiff "entitled to a fair trial, not a perfect trial"].) He filed suit stating various claims against defendants, conducted substantial discovery, and largely defeated defendants' motion for summary judgment.[4] He participated in selecting his jury and tried his case to that jury. And he filed posttrial motions and this appeal.

If he doubted the fairness of the process, the justice system had in place procedures for redress of those grievances. Jones had the opportunity to address juror bias before the jury was sworn. (See *Box v. Superior Court* (2022) 87 Cal.App.5th 60, 70 ["Together, *Batson* and *Wheeler* give litigants the right to challenge an opponent's purposeful discrimination in exercising preemptive strikes"].) He asserted no such challenge. Before and during trial, he availed himself to protections afforded by the Evidence Code. To challenge the jury verdict, he filed motions for new trial and JNOV. Although Jones argued "jury misconduct," nowhere in the papers did he identify jury bias, implicit bias, or jury nullification as the misconduct. At oral argument, Jones's counsel confirmed the only misconduct alleged by Jones is "that the jury rendered a verdict that didn't accord with the substantial evidence."

Finally, while we appreciate amicus curiae's briefing, we are not persuaded. Extra-record evidence of a mock jury trial, information on racism in Orange County, and

---

4       The judge who ruled on the summary judgment motion — and found triable issues of material fact for many of Jones's claims — also presided over trial.

Assembly Bill No. 3070[5] are not helpful, particularly since Jones does not assert a challenge to the composition of the jury. (See *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 572 ["An amicus curiae ordinarily must limit its argument to the issues raised by the parties on appeal, and a reviewing court need not address additional arguments raised by an amicus curiae"].) As for the request for "clarification" of existing law on the applicable appellate standard in this case, it is apparent amicus curiae *is* "advocating a change in the law."[6] "[O]ur role as an appellate court is to interpret the law," not to change it. (*California Correctional Peace Officers' Assn. v. State of California* (2010) 188 Cal.App.4th 646, 656.)

---

[5] In 2020, the Legislature passed Assembly Bill No. 3070 (2019–2020 Reg. Sess.) (Stats. 2020, ch. 318, §§ 1–3), which enacted Code of Civil Procedure section 231.7. The statute codifies the *Batson*/*Wheeler* principle prohibiting unlawful discrimination in the use of peremptory challenges. For civil trials, however, the law does not go into effect until January 2026. (*Unzueta v. Akopyan* (2022) 85 Cal.App.5th 67, 77, fn. 6.)

[6] Amicus curiae argues "the relevant question for appellate courts conducting substantial evidence review in harassment cases should be whether there is substantial evidence that a reasonable person of the same protected class as the plaintiff would conclude that the harassment was or was not severe, pervasive, or harmful. When this standard of review is applied to the instant case, the judgment must be reversed as a matter of law."

## DISPOSITION

The judgment is affirmed.  Respondents to recover costs on appeal.

DELANEY, J.

WE CONCUR:

SANCHEZ, ACTING P. J.

GOODING, J.